**LIFSCHULTZ FAST FREIGHT, INC., Plaintiff,**

v.

**CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, Yellow Freight Systems, Inc., and Roadway Express, Inc., Defendants.**

Civ. A. No. 6:87–477–20.

United States District Court,
D. South Carolina,
Greenville Division.

Oct. 29, 1992.
As Amended Nov. 19, 1992.

**1280**

Wayne A. Cross and Edward A. Mc-Donald, New York City, A. Camden Lewis, Columbia, S.C., Thomas P. Puccio, New York City, William J. Quirk, Columbia, S.C., for plaintiff.

Steven E. Sigalow, Kathleen B. Burke, Joseph C. Weinstein, Cleveland, Ohio, Fletcher C. Mann and Steven E. Farrar, Greenville, S.C., for Roadway Express, Inc.

Paul R. Duke and S. William Livingston, Jr., Washington, D.C., Charles Porter, Columbia, S.C., for Yellow Freight Systems.

J. Thomas Rosch and Daniel M. Wall, San Francisco, Cal., William A. Coates, Greenville, S.C., for Consolidated Freightways Corp.

## MEMORANDUM OPINION

HERLONG, District Judge.

This matter is before the court on the motions filed by the defendants, Consolidated Freightways Corporation of Delaware ("Consolidated"), Yellow Freight Systems, Inc. ("Yellow"), and Roadway Express, Inc. ("Roadway"), for summary judgment. The defendants have also moved to exclude certain testimony. For the reasons stated herein, the court grants the defendants' motions to exclude testimony and for summary judgment.

## I. FACTS AND HISTORY

This case arises out of a dispute involving corporations which are, or were at one time, competitors in the trucking industry. The defendants are all motor common carriers.[1] Prior to 1980, the plaintiff, Lifschultz Fast Freight, Inc. ("Lifschultz"), was a freight forwarder.[2] The main difference between a freight forwarder and a motor common carrier is that a freight forwarder relies on other common carriers to move the freight between cities either by rail, motor, or water. When Lifschultz was a freight forwarder, it generally used railroads to transport freight between cities. In 1980, Lifschultz became a motor common carrier and competed directly against the defendants.

Before 1980, the Interstate Commerce Commission ("ICC"), under the Motor Carrier Act of 1935, strictly regulated motor common carriers and freight forwarders. In this period, the ICC controlled rates that could be charged and restricted price competition. Information on the costs of operation was collected and reviewed by rate bureaus. Rate bureaus are groups of carriers operating in particular regions which

---

1. " '[M]otor common carrier' means a person holding itself out to the general public to provide motor vehicle transportation for compensation over regular or irregular routes, or both." 49 U.S.C. § 10102(14) (1992).

2. " '[F]reight forwarder' means a person holding itself out to the general public ... to provide transportation of property for compensation and in the ordinary course of its business—

(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;

(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and

(C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce Commission...."
49 U.S.C. § 10102(9) (1992).

are sanctioned by the ICC to develop rate tariffs based upon information on operating costs submitted by its members.[3] Based on these tariffs, the ICC set the rates that could be charged. The rate bureaus for freight forwarders were not the same as the rate bureaus for motor common carriers. Rates for freight forwarders were set independently of the rates for motor common carriers. Lifschultz, however, asserts that rates for freight forwarders paralleled and were patterned after the rates for motor common carriers.

The Motor Carrier Act of 1980 deregulated the trucking industry. Since deregulation, there has been far greater price competition in the trucking industry. In fact, many carriers have been unable to compete and have exited the industry since deregulation. This was one of the objectives of the regulatory reform. Enhanced competition was intended to drive inefficient carriers or excess capacity out of the market.[4] Although the ICC no longer controls rates, it still has regulatory power over the trucking industry. Carriers must file tariffs with the ICC which indicate what rates they are charging. The ICC has maintained the power to investigate complaints about a carrier and to determine the reasonableness or lawfulness of a rate that a motor common carrier proposes to charge. *See, e.g.,* 49 U.S.C. §§ 10321, 10708, 11701, and 11702 (1992).

The portion of the trucking market in question in this case is the carrying of "less than truckloads" ("LTL") of freight. LTL shipments are between 100 and 10,000 pounds. LTL freight must be consolidated with other shipments of LTL freight to fill a truck. The LTL market is defined by shipping routes, called lanes, between cities. A competitor in the LTL market must have a terminal in each city at the ends of the lanes it services. An LTL carrier must also have facilities to pick up the freight and to deliver it to the ultimate receiver of the shipment in the cities at each end of the lanes.

In March of 1987, Lifschultz filed this action claiming that the defendants had violated the Sherman Anti-trust Act, 15 U.S.C. §§ 1 and 2, by conspiring to eliminate competition in the trucking industry. On September 29, 1988, Lifschultz filed its Second Amended Complaint in which it added four claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.,* and a claim under the South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C.Code Ann. § 39–5–10 *et seq.* (Law.Co-op.1976).

Lifschultz's claims are based upon an alleged conspiracy among the defendants and involving the International Brotherhood of Teamsters ("Teamsters"), more commonly known as the Teamsters Union, and upon actions allegedly taken by the defendants in furtherance of this conspiracy. Lifschultz alleges that in the mid 1960s, the Teamster's president, Jimmy Hoffa, decided that concentration of the LTL market in a small number of trucking companies would be in the best interest of the Teamsters. Lifschultz alleges that based upon this determination, in approximately 1965, the Teamsters entered into a conspiracy with the defendants to eliminate competitors from the LTL market. The conspiracy is alleged to have been executed by different tactics at different time periods. In the period prior to deregulation, Lifschultz asserts that the defendants conspired to create a price squeeze to reduce or eliminate the profits of their competitors. The defendants allegedly provided false or misleading information to the rate bureaus. The rate bureaus developed tar-

---

**3.** Prior to deregulation, there were fifteen major motor common carrier rate bureaus. In 1992, there are nine rate bureaus: New England MFB; Eastern Central M.C.A.; Niagara Frontier T.B.; Middle Atlantic Conference; Central States M.F.B.; Middlewest M.F.B.; Southern M.C.R.B.; Rocky Mountain M.T.B.; and the Pacific Inland T.B. *See The U.S. Motor Carrier Industry Long After Deregulation,* Report by the ICC, Office of Economics at 59 n. 50 (1992). The allegations

in this case involve only the Eastern Central M.C.A. and the Rocky Mountain M.T.B. The Eastern Central region includes the lane or route of business between New York/New Jersey and Chicago.

**4.** *See The U.S. Motor Carrier Industry Long After Deregulation,* Report by the ICC, Office of Economics at 42 and 46–57 (1992).

iffs based upon this information and sent this information to the ICC, which set the rates for the trucking industry. Lifschultz alleges that, although the rates were set above operating costs, they allowed very little profit and were below what the rates should have been without the false or misleading information. The Teamsters then allegedly agreed to give the defendants lower labor costs, to stage strikes against the defendants' competitors, and not to strike against the defendants. This would raise the costs of operations of the defendants' competitors. According to Lifschultz's allegations, this rise in costs combined with small profit levels because of the rates being set artificially low was intended to have, and did have, the effect of reducing or eliminating the profits of the defendants' competitors.

After deregulation in 1980, Lifschultz alleges that the means by which the conspiracy was conducted changed. In this time period, the defendants allegedly worked together to provide false information to the rate bureaus and the ICC which would · allow the defendants to charge below cost rates to certain customers and in certain areas of the country. ·Lifschultz alleges that these rates were part of a scheme of predatory pricing by the defendants and were designed to force the defendants' competitors out of the LTL market.

## II. EVIDENCE OF CONSPIRACY

### A. Direct Evidence

In its memorandum in opposition to the defendants' motion for summary judgment, Lifschultz states that it has presented the court with "compelling, almost chilling, direct testimony of the organization and operation of the defendants' conspiracy to eliminate competition in the LTL indus-

try." [5] This "direct testimony" consists of the depositions and affidavits of Ralph Picardo ("Picardo") and Glenn Hall ("Hall"). Lifschultz's claim of an antitrust conspiracy hinges upon the testimony of these two men.

### 1. Picardo

Picardo has admitted to committing perjury and has been convicted of conspiracy to commit murder. Most of his testimony is based upon statements allegedly made to him over 17 years ago by his associates in the Provenzano Organized Crime Group.[6] In his deposition, Picardo testified about the existence of a conspiracy between the Teamsters and the three defendants to drive other trucking companies out of business. He asserts that the Teamsters aided the defendants by ensuring labor peace, providing them breaks in arbitration, and allowing the defendants to use nonunion labor. Despite his allegations that the conspiracy was widespread, Picardo failed to name a single employee of the defendants who participated in this conspiracy.

Picardo testified that Yellow gave Teamster officials payoffs to obtain labor advantages. Picardo stated that he was told this by a vice president of Yellow's operation, but he could not supply the name of the Yellow official or the date of the conversation. Picardo testified that he was told by a Teamster shop steward at Roadway that Roadway had paid the steward to obtain favors from the Teamsters. Again, Picardo could give neither the date of the conversation nor the name of the steward who told him. Furthermore, Picardo testified that he actually saw a Roadway shop steward make payoffs to Salvatore Briguglio ("Briguglio").[7] Nevertheless, Picardo again could not supply the name of the shop steward, the location of the terminal, or the dates of the payoffs. According to

---

5. Plaintiff's memorandum at 19.

6. "[T]he Provenzano Group was ... a constituent part of the Genovese Crime Family and was subject to the direction and control of the Family's hierarchy." *United States v. Local 560 (I.B.T.)*, 694 F.Supp. 1158, 1170 (D.N.J.), *aff'd mem.*, 865 F.2d 253 (3d Cir.1988), *cert. denied,*

489 U.S. 1068, 109 S.Ct. 1345, 103 L.Ed.2d 814 (1989).

7. Salvatore Briguglio, a convicted felon, was indicted with Anthony Provenzano for the murder of Anthony Castellito. Briguglio was murdered in 1978 while under indictment.

Picardo, Briguglio and Armand Faugno[8] told him that they had received bribes from Consolidated in exchange for labor peace. Picardo told of a meeting where Consolidated officials discussed the conspiracy. Picardo admitted, however, that he was not in the room when the alleged conversation took place but asserts he was told of it later by his associates.

Picardo testified that the Teamsters had created a "hit list" of targeted carriers, which was shown to the defendants. At one point in his deposition, Picardo stated that he did not remember which companies were on the "hit list." At a later point in the deposition, however, Picardo contradicted himself and asserted that Lifschultz was on the list.

According to Picardo's testimony, the Teamsters not only allowed the favored carriers, such as the defendants, to use nonunion labor, but the union itself helped the carriers set up nonunion companies for their use. Picardo stated that he personally set up some nonunion trucking companies to be used by the favored carriers, but admitted that he never established such a company for any of the defendants.

In another of his many unsupported statements, Picardo testified that he knew the defendants operated at a loss in certain areas of the country in order to undercut their competitors' prices. Picardo stated that he was told by Anthony Provenzano[9] and Briguglio that Roadway operated at a loss in the New York/New Jersey area in the 1970s. Once again, Picardo supplied neither the date nor the location of that conversation. Picardo stated that he knew Consolidated operated at a loss in the New York and Chicago areas. Nevertheless, no one at Consolidated told him this; he knew it because "[i]t was public knowledge in the industry." The record, however, contains a great number of financial documents of the defendants which the defendants assert demonstrate that they did not operate below cost in any area of the country or to any single customer to any significant degree. Lifschultz has failed to point to any part of this documentation in the record that supports its claim that the defendants operated below costs.

Picardo claims that Briguglio and the Provenzano brothers told him that Yellow was part of the conspiracy. Picardo testified that he himself worked for Yellow as a part-time driver sometime between 1977 and 1984. During this time he claims to have seen bills of lading showing that Yellow had been allowed by the Teamsters to misclassify freight in order to circumvent union pay conditions. He could not state the exact nature of the cargo or the identity of the shippers. Additionally, while working for Yellow, he contends that he loaded freight for customers whose bills showed that they were receiving allowances for doing the loading themselves, thus indicating that the customers received a discounted freight rate. Citing security concerns, however, Picardo refused to pinpoint the time he worked for Yellow and refused to disclose the alias he assumed while working there.

### 2. Hall

Hall is a long-time trucker and a former Teamster. Despite never holding any union office higher than local shop steward, Hall asserts that he was an intimate friend of Jimmy Hoffa's. In his deposition, he testified that the conspiracy among the defendants and the Teamsters began in the 1950s. He allegedly was told of the conspiracy by Jimmy Hoffa himself, and over the years discussed the conspiracy with three Teamsters presidents: Jimmy Hoffa; Frank Fitzsimmons; and Roy B. Williams. According to Hall, it was the Teamsters' goal to reduce the trucking industry to a few large unionized companies. Hall testified that he furthered the conspiracy by bribing shippers with bottles of liquor with hundred dollar bills wrapped around their necks. Hall stated that pick-up and deliv-

---

8. Armand Faugno was indicted for loansharking and counterfeiting. He disappeared in 1972 while under indictment.

9. Anthony Provenzano was a convicted murderer and a member of the Genovese Crime Family. He died while in prison in 1988. He was the brother of Nunzio Provenzano, a convicted felon.

ery drivers told him that Yellow allowed customers to misclassify freight, but Hall could not give the names of any of the drivers, the names of any of the customers who received this benefit, or the dates this misclassification took place. He claims that he was also told by unidentified Roadway drivers that Roadway did the same thing.

### B. Motion to Exclude Testimony

■ The defendants have moved to exclude the testimony of Picardo and Hall, claiming that it is inadmissible hearsay and thus barred by rule 802 of the Federal Rules of Evidence. The basis for this argument is that their testimony consists of statements made by other individuals [10] that a conspiracy between the Teamsters and the defendants existed. Lifschultz argues that their testimony is admissible under the coconspirator exception to the hearsay rule. Fed.R.Evid. 801(d)(2)(E). That rule provides that an admission by a party-opponent is not hearsay if the "statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Lifschultz asserts that the people who told Picardo and Hall about the conspiracy were coconspirators with the defendants and were making statements during the course and in furtherance of the conspiracy.

"The party proffering statements as non-hearsay under Rule 801(d)(2)(E), must demonstrate the existence of a conspiracy and that the statements were made in the course of and in furtherance of that conspiracy." *Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co.*, 951 F.2d 613, 621 (4th Cir.1991) (citing *United States v. Jackson*, 863 F.2d 1168, 1171 (4th Cir.1989)). The court need not look only to independent evidence when deciding whether a conspiracy existed. Instead, a court, "in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay

statements sought to be admitted." *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987) (citing Fed.R.Evid. 104(a) for the proposition that in determining questions of admissibility, the court is not bound by the rules of evidence, except those with respect to privileges, and may therefore consider hearsay). In deciding whether to admit the disputed testimony as statements of coconspirators, this court is free to examine all the evidence, including the testimony itself, to determine if a conspiracy did in fact exist. Therefore, in order to demonstrate that the testimony of Hall and Picardo is admissible, Lifschultz must show that (1) a conspiracy existed; (2) that the declarants and the defendants were members of the same conspiracy; and (3) that the statements were made in the course of and in furtherance of that conspiracy. *See Jackson*, 863 F.2d at 1171. The offering party, Lifschultz, must prove these preliminary facts by a preponderance of the evidence. *See Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. at 2778–79.

Considering the evidence in the light most favorable to the plaintiff, this court finds that Lifschultz has not proven by a preponderance of the evidence that a conspiracy did in fact exist among the defendants and the Teamsters. The court reaches this conclusion even after carefully considering the disputed testimony of Picardo and Hall. Because Lifschultz has failed to demonstrate the existence of a conspiracy, the testimony of Picardo and Hall cannot be admitted as an exception to hearsay under Fed.R.Evid. 801(d)(2)(E). The defendants' motion to exclude their testimony is hereby granted.

### III. ANTI–TRUST

Under Federal Rule of Civil Procedure 56(e), only admissible evidence may be offered in opposition to a motion for summary judgment. *See* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2722

---

**10.** Picardo and Hall fail to name most of their sources and many of those they do identify are now dead.

(1983). Because the antitrust conspiracy claim is based upon the inadmissible testimony of Picardo and Hall, the court must grant summary judgment as to this issue.

■ Even if the testimony were admissible, however, summary judgment would still be appropriate as to this cause of action. In examining the antitrust conspiracy cause of action, the court is guided by the United States Supreme Court case of *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), which is factually similar to the one before the court. In *Matsushita*, the plaintiffs were American television manufacturers who claimed that Japanese television makers were engaging in predatory pricing in the United States. The plaintiffs claimed that the Japanese could afford to sell televisions so cheaply in this country because they were overpriced in Japan.

The Court held that in an antitrust conspiracy case, in order to survive a motion for summary judgment, the plaintiffs must establish a question of material fact as to whether the defendants entered into an illegal conspiracy which caused the plaintiffs to suffer a cognizable injury. A "plaintiff seeking damages for a violation of § 1 [of the Sherman Act] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently.... Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents." *Matsushita*, 475 U.S. at 588, 106 S.Ct. at 1356.

Even if the testimony of Picardo and Hall were admissible, it is simply too incredible to support Lifschultz's conspiracy theory. Their testimony consists primarily of gossip and rumors passed on to them by often unidentified individuals. Even when the individuals are identified, dates, locations, and other such pertinent information is usually not provided. Most importantly, not once does either Picardo or Hall name a single employee of the defendants involved in the alleged conspiracy, and not once does either man present evidence that the defendants agreed among themselves to the schemes allegedly devised by the Teamsters. While the testimony of Picardo and Hall may be evidence of illegal deals between Teamster officials and trucking companies, it provides no evidence of a conspiracy among the defendants to drive Lifschultz, or any other company, out of business.

### A. Oxenfeldt Report

■ Lifschultz's circumstantial evidence of a conspiracy is theorized in the Oxenfeldt Report. This report describes the motive and opportunity of the defendants to enter into the conspiracy. The report surmises that the present composition of the trucking industry would be different if it were not for the alleged conspiracy. Oxenfeldt's findings read more like a cheap novel than an economic report. For the most part, the report is merely a series of unsupported conclusions. When Oxenfeldt does support his conclusions, they are often based upon the testimony of Hall and Picardo. The following are examples of Oxenfeldt's unsupported speculation. As to the pre–1980 part of the conspiracy, Oxenfeldt writes: "We strongly doubt that the cartel members ever reached a formal agreement that was reduced to writing. Nonetheless, the cartel members realized that they had agreed to cooperate with the union and knew that other large carriers did the same." [11] This is not circumstantial evidence of a conspiracy. It is unsupported opinion on the part of Oxenfeldt. Later, when explaining how the defendants carried out the conspiracy before 1980, Oxenfeldt writes the following:

> The conspirators *could* take customers away from rivals by conducting intensive sales efforts which were directed at their rivals' most valuable customers. That *could* be done by, among other things, spending large sums on lavish entertainment, gifts for prospective customers, bribes of traffic managers, misclassifica-

---

**11.** Oxenfeldt Report at 3–3.

tions of freight, phony allowances, charging less than the legally filed rate, and the like. In addition, they *could* defame their rivals and deprecate their service and reliability. (emphasis added).[12]

This paragraph, like much of the report, is written in the conditional, stating not what the defendants *did*, but what they *could have done*. As evidence of the defendants' post–1980 predatory pricing, Oxenfeldt points to the fact that the defendants increased market share after deregulation.

> The most striking feature of the defendants' plan to increase market share after deregulation in 1980 was the environment in which it occurred. The legislation aimed to increase competition by facilitating entry of newcomers to the industry—therefore, the defendants should have expected great difficulty even in maintaining their present market shares. They nevertheless were determined to increase them. In light of large, strong competitors like [Lifschultz], this determination necessarily required predatory pricing to succeed.[13]

This statement, like most of the conclusions in the report, is nothing more than mere speculation. Oxenfeldt gives no firm evidence of the existence of a conspiracy to drive Lifschultz and other trucking companies out of business. Furthermore, Oxenfeldt admitted in his deposition that economists are not competent to render opinions concerning the existence of a conspiracy. This being the case, his report provides no support for Lifschultz's antitrust conspiracy claim against the defendants.

In addition, the very fact that the trucking industry was strictly regulated until 1980 makes such a conspiracy implausible. The ICC set the shipping rates, and if the defendants somehow managed to have the rates set too low, the other trucking companies would surely have complained. At the summary judgment hearing, Lifschultz estimated that during the pre–1980 stage of the conspiracy, the defendants controlled forty percent (40%) of the market. If this is so, then the defendants' "targets" controlled the majority of the market. To believe that the ICC could be manipulated by three trucking companies at the expense of all the other trucking companies stretches the bounds of believability.

### B. Reasonableness of the Conspiracy

■ The most profound flaw in Lifschultz's conspiracy theory is that it is simply not reasonable. Lifschultz asks this court to believe that the Teamsters and the defendants entered into a conspiracy in the mid 1960s (or the 1950s, if one believes the testimony of Hall) that endured for decades. For such a conspiracy to exist, the conspirators would have to have had the patience of Job. If one believes Lifschultz, the Teamsters were allegedly willing to make major concessions to the defendants year after year, in exchange for bribes to individual Teamster officials, for the hope that one day in the distant future the Teamsters would reach the promised land where the entire trucking industry would be unionized. Throughout the passage of time and changes in union leadership, the Teamsters were allegedly willing to make concessions even though 15 years passed without any real evidence that the conspiracy was working.[14] Such an idea is preposterous.[15] As the Supreme Court stated in the *Matsushita* case, "if the factual context renders respondents' claim implausible ... respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* 475 U.S. at 587, 106 S.Ct. at 1356. Lifschultz has failed to provide the persuasive evidence required.

---

12. Oxenfeldt Report at 3–17.

13. Oxenfeldt Report at 4–10.

14. For example, as of 1980, roughly fifteen years after the conspiracy began, Lifschultz was still making a profit.

15. Furthermore, Lifschultz employed no Teamster workers in the New York/New Jersey area, the center of his operation. Teamsters were employed in the Chicago area, but only a small number. With such a small number of Teamster employees, it is absurd to think that the Teamsters could have much effect on Lifschultz's costs.

## C. Predatory Pricing

Lifschultz alleges that after deregulation in 1980, the defendants implemented predatory pricing to obtain their goal of driving Lifschultz out of business. Predatory pricing has two stages. In the first, those engaged in the antitrust conspiracy cut their prices to below cost levels, thus sustaining a loss in an effort to drive competitors out of business.[16] After the competitors are eliminated, the predators have achieved an oligopoly,[17] and the second stage begins. At this point they dramatically increase their prices to regain their earlier losses.

> [I]t is not enough simply to achieve monopoly power, as monopoly pricing may breed quick entry by new competitors eager to share in the excess profits. The success of any predatory scheme depends on *maintaining* monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain. Absent some assurance that the hoped-for monopoly will materialize, *and* that it can be sustained for a significant period of time, [t]he predator must make a substantial investment with no assurance that it will pay off.

*Matsushita,* 475 U.S. at 589, 106 S.Ct. at 1357 (quotations omitted) (emphasis in original). In a recent Fourth Circuit case, the court held that "predatory pricing must involve, in addition to some level of below-cost pricing that is harmful to competition, the rational expectation of later realizing monopoly profits." *Liggett Group, Inc. v. Brown & Williamson Tobacco Corp.,* 964 F.2d 335, 339 (4th Cir.1992).

In support of its predatory pricing claim, Lifschultz looks at the defendants' prices in several lanes and concludes that they were below cost. Lifschultz points out that in some years the defendants lost money on some of their lanes. Nevertheless, it is the usual practice of LTL trucking companies to sell their services not on a lane-by-lane basis, but rather on a national basis. Thus, the trucking companies quote prices to shippers that apply to all the places the goods will be delivered. In his deposition, David Lifschultz, the president of the plaintiff, admitted that trucking companies generally negotiate rates for all destinations and did not offer different prices for different areas. This being the case, the pertinent inquiry is not did the defendants lose money in specific lanes, but did they lose money on specific shippers.

### 1. Below-cost pricing

■ Lifschultz has failed to demonstrate that the defendants offered across the board below-cost prices to any shipper. "[P]redatory pricing has as its aim the elimination of competition." *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 118, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986). For a plaintiff to maintain an action for predatory pricing, the below-cost pricing must threaten competition in the industry. *See Morgan v. Ponder,* 892 F.2d 1355 (8th Cir.1989). Accepting Lifschultz's "evidence" of below-cost pricing as accurate, it affected only a minute amount of business. In 1985, for example, the total amount of Lifschultz's business allegedly affected was Nine Hundred Ninety-Eight Thousand Fifty-Four Dollars ($998,054.00). That amount is three percent (3%) of Lifschultz's total business for that year, and is only twenty-six one hundredths of one percent (.26%) of the LTL business existing in Lifschultz's markets in 1985.[18] This insignificant amount of business allegedly affected by predatory pricing could have no meaningful effect on competition.

### 2. Expectation of recouping losses

Even if Lifschultz were able to prove below-cost pricing that adversely affected

---

**16.** Although a single seller can use predatory pricing in an attempt to obtain monopoly power, in light of the facts of the case, predatory pricing is analyzed as it is carried out by more than one seller.

**17.** "An oligopoly is a market situation in which a few producers control the demand from many buyers." Webster's Seventh New Collegiate Dictionary 588 (1967).

**18.** These figures were provided by the defendants. Lifschultz did not object to their accuracy.

competition, it has completely failed to demonstrate that the defendants had a rational expectation of recouping their losses by realizing monopoly profits. "[A] conspiracy, which could not hope to recoup its expenses incurred from alleged below-cost pricing and [is] therefore economically senseless, [does] not violate the antitrust laws." *Liggett,* 964 F.2d at 339 (citing *Matsushita,* 475 U.S. at 597–98, 106 S.Ct. at 1361–62). Recoupment would be impossible because there are no significant barriers to entrance into the LTL trucking business. If the defendants attempted to raise prices dramatically, new companies would enter the business and quickly undercut the defendants' prices, effectively "stealing" their customers. In 1982, the ICC concluded that "[t]here is little likelihood of [predatory pricing] in the motor carrier industry.... [P]redation by motor carriers [is] uneconomic, since entry costs are so low that a predator could never long enjoy its monopoly price." *Petition for a Declaratory Order—Lawfulness of Volume Discount Rates by Motor Common Carriers of Property,* 365 I.C.C. 711, 714 (1982).

Finally, Lifschultz has failed to present evidence that it has suffered injury brought about by the defendants' alleged antitrust activity. Lifschultz claims that the conspiracy and price squeeze between the 1960s and 1980 hurt its business. Nevertheless, as of 1980, Lifschultz was still realizing a profit. Lifschultz started losing money after 1980 and blames its losses on predatory pricing. But in 1980 the industry was deregulated, and about this time Lifschultz changed from being a freight forwarder to a common carrier. Either of these changes or simply bad management could have been detrimental to Lifschultz. Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356; *See also Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984). Antitrust injury is an essential element of an antitrust claim. *Atlantic Richfield Co. v. U.S.A. Petroleum Co.,* 495 U.S. 328, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990). "To survive a motion for summary judgment ..., a plaintiff ... must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." *Matsushita,* 475 U.S. at 588, 106 S.Ct. at 1356 (quoting *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)).

Simply put, Lifschultz has not presented evidence which creates a question of material fact as to the existence of a conspiracy among the defendants to drive small trucking companies such as Lifschultz out of business. For this reason, summary judgment as to the antitrust cause of action is appropriate.

## IV. RICO

Lifschultz has asserted four claims for violations of RICO. The claims are for violations of 18 U.S.C. §§ 1962(a), (b), (c), and (d).

18 U.S.C. § 1962 imposes liability on those who engage in a pattern of racketeering activity if they also do the following: invest income derived from the pattern of racketeering activity in the operation of an enterprise engaged in interstate commerce (§ 1962(a)); acquire or maintain, through the pattern of racketeering activity, any interest in or control over such an enterprise (§ 1962(b)); or conduct the affairs of such an enterprise through a pattern of racketeering activity (§ 1962(c)). Section 1962(d) makes it a crime to conspire to violate §§ 1962(a), (b), or (c). To establish a civil RICO claim for the violation of § 1962, Lifschultz must prove "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (footnote omitted). Lifschultz must also prove that it was "injured in [its] business or property by reason of the alleged violation of section 1962." *Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988) (citing 18 U.S.C. § 1964(c)). Therefore, Lifschultz is required to make two closely related showings: (1) that it suffered inju-

ry to its business or property; and (2) that this injury was caused by the predicate acts that make up the violation of § 1962. *Id.* at 1187. In this case, the defendants assert that there is no evidence of racketeering activity and that the alleged violation was not the proximate cause of Lifschultz's injuries.

## A. Predicate Acts

The predicate acts that constitute "racketeering activity" under RICO are listed in 18 U.S.C. § 1961(1). In this case, the alleged predicate acts are (1) bribery in violation of 18 U.S.C. § 1952, (2) mail fraud in violation of 18 U.S.C. § 1341, and (3) wire fraud in violation of 18 U.S.C. § 1343.

### 1. Bribery

■ Lifschultz alleges that acts of bribery are presented in the depositions of Donna Spinelli,[19] Picardo,[20] and Hall.[21] Donna Spinelli ("Spinelli") is a former employee of Lifschultz. Her testimony relates only to Yellow. Her testimony is hearsay testimony of what she was told by Frank Rapacelli ("Rapacelli") of Dynamic Classics and Ed Fowler ("Fowler") of Florasyth, two former customers of Lifschultz who had moved their business to Yellow. Spinelli asserts that Rapacelli told her that Yellow provided employees of Dynamic Classics with a trip to Atlantic City for an evening of dinner, shows, and some gambling. Spinelli also states that Rapacelli told her that Yellow provided Dynamic Classics with rate discounts that Lifschultz could not offer. Spinelli states that Fowler told her that Yellow provided better entertainment to its customers than Lifschultz. Spinelli states that she tried to give Fowler a bottle of scotch at Christmas, but Yellow had already given him a case of scotch. Also, Spinelli tried to give Fowler two tickets for grandstand seats to a New York Mets

baseball game, but Yellow had already given him six tickets for box seats. Spinelli also asserts that she attempted to take Fowler to lunch, but he would not go because Yellow provided dinner.

Spinelli's testimony does not demonstrate any bribe. Even if the court ignores the hearsay problem, Spinelli's testimony merely reveals that Yellow placed more emphasis on customer entertainment than did Lifschultz. This is particularly evident from the testimony regarding Fowler. Lifschultz attempted to give him gifts and to provide entertainment for him. Spinelli complains because Yellow had a larger budget for gifts and entertainment so that her attempts to gain favor with Fowler through gifts and entertainment were unsuccessful. It is clear that Lifschultz engaged in the same type of conduct in regards to entertainment and gifts which it asserts is bribery when done by the defendants. Therefore, if the court were to find Yellow's alleged conduct constituted bribery, Lifschultz's conduct would also constitute bribery, or at least attempted bribery. The court cannot agree with Lifschultz's definition of bribery. The court finds that entertaining customers and prospective customers and giving Christmas gifts as presented in Spinelli's testimony is not sufficient to support an allegation of bribery in violation of 18 U.S.C. § 1952.[22]

As has been demonstrated previously, Picardo's and Hall's testimony is generally a series of unsupported allegations. Nevertheless, even when the problem with their reliability is disregarded, Picardo's and Hall's testimony is insufficient to support Lifschultz's allegations of bribery.

Picardo stated in his deposition that he was aware that Yellow and Roadway were paying cash bribes to traffic managers of companies in order to get their business.

---

**19.** Lifschultz cites to pages 40–43, 59–60, 62, 68–71, and 75–79 of Spinelli's deposition taken Thursday, August 25, 1988.

**20.** Lifschultz cites to pages 36–41, and page 326 of Picardo's deposition taken July 13, 1989.

**21.** Lifschultz cites to pages 120–121 of Hall's deposition taken June 27, 1990.

**22.** This conclusion is further supported by 49 C.F.R. § 1207.1(36) (1991), which presents a list of acceptable business entertainment expenses and indicates which expenses may be included in a trucking company's operating costs. Each of the activities involved in this case is included on this list of acceptable business entertainment expenses.

He stated that he did not recall if Consolidated paid such bribes. When he was asked how he was aware of the alleged payments, Picardo stated that when he was working as a salesman for a competitor of the defendants, traffic managers for certain companies told him that he had to pay a bribe to get their business. Picardo then states that all three of the defendants did business with these certain companies. From this testimony, Lifschultz concludes that the defendants must have paid bribes to the traffic managers. Such a conclusion requires a tremendous leap of faith, which this court will not make. The fact that certain traffic managers allegedly attempted to extort bribes from Picardo does not prove that these managers attempted the same thing with the defendants, much less that the defendants paid any such bribes.

Hall states that a friend of his, Harvey Cole, told Hall that he had gone with an unnamed official of Yellow in 1955 or 1956 to deliver a check for about Two Thousand Dollar ($2000.00) to a shipper, Armco Steel. This is clearly hearsay testimony. Also it is ten years before Lifschultz asserts that the conspiracy was formed.[23] Therefore, the court finds that there is no evidence that would allow a rational trier of fact to find that the alleged predicate act of bribery occurred.

### 2. Mail and wire fraud

■ The alleged predicate acts of mail fraud and wire fraud are closely connected. They involve the transmission of allegedly false or misleading information to the rate bureaus, to customers, and to prospective customers. The mail and wire fraud statutes make it unlawful to use the mail or wire, radio, or television to execute or attempt to execute "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. §§ 1341 and 1343 (1989) (the quoted language appears in both § 1341

and § 1343). At the hearing, Yellow's attorney stated that there was no evidence of any false statements to the rate bureaus or anyone else.[24] Lifschultz's attorney responded that the evidence of false statements was that the United States Department of Justice has asked the ICC to investigate the rate bureaus, and Lifschultz's attorney believes that the Department of Justice has asked the ICC to suspend the anti-trust immunity for the rate bureaus.[25] Then, in response to a question from the court, Lifschultz's attorney stated that he was not aware of any other evidence of false statements being made to the rate bureaus.[26] After an examination of the record, the court also is not aware of, and is unable to find, any other evidence that indicates that any statement made, representation given, or information provided by the defendants to the rate bureaus, the ICC, or customers was false or fraudulent. In the complaint, Lifschultz lists nine letters or communications that allegedly are examples of mail and wire fraud by the defendants. However, Lifschultz has not demonstrated in any of the voluminous briefs or reports submitted in this case how any statement or representation in any of these letters or communications is false or fraudulent. Because there is a lack of evidence that any false or fraudulent representation was made by the defendants, a rational trier of fact could not find that the defendants committed the predicate acts of mail or wire fraud.

As stated previously, an essential element of a civil RICO claim is a "pattern of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). A "pattern" of racketeering activity consists of at least two acts of racketeering activity committed within ten years of each other. 18 U.S.C. § 1961(5) (1984). Since the record cannot support the conclusion that any predicate acts of racketeering activity oc-

---

**23.** *See* Plaintiff's memorandum at 7–8 (Stating that the conspiracy was formed in the "mid 1960s.").

**24.** Transcript of Motions Hearing at 116–17.

**25.** Transcript of Motions Hearing at 119, lines 7–11.

**26.** Transcript of Motions Hearing at 119, line 22.

curred, a pattern of racketeering activity could not have existed. Therefore, Lifschultz has failed to present evidence of racketeering activity, much less a pattern of racketeering activity, both of which are essential elements to Lifschultz's civil RICO claims. For this reason, summary judgment must be granted as to the RICO claims.[27]

## B. Proximate Cause

■ To bring a RICO action, a person must be "injured in his business or property by reason of a violation of section 1962...." 18 U.S.C. § 1964(c). The Supreme Court has interpreted this language to require that the violation of RICO be the proximate cause of the injury. *Holmes v. Securities Investor Protection Corp.,* — U.S. —, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). There must be "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* — U.S. at —, 112 S.Ct. at 1318. The plaintiff must show that it has suffered injury to its business or property and that this injury was caused by the predicate acts of racketeering activity that make up the violation of § 1962. *Brandenburg v. Seidel,* 859 F.2d 1179, 1187 (4th Cir.1988). Lifschultz is no longer in business. It, therefore, has suffered an injury. The defendants assert that there is no evidence that the alleged violations of RICO were the proximate cause of any injury to Lifschultz. The defendants point out that Lifschultz ceased being a profitable corporation immediately after the trucking industry was deregulated and immediately after it was converted from a freight forwarder into a motor common carrier. Lifschultz contends that the fact that the defendants grew in size when large numbers of carriers, including Lifschultz, were going out of business is circumstantial evidence that the defendants must have conspired to restrain competition and is sufficient to create a genuine issue of fact as to the cause of Lifschultz's injuries. The determination of legal or proximate cause is properly one of law for

the court, taking into consideration such factors as the foreseeability of the particular injury, the intervention of other independent causes, and the factual directness of the causal connection. *Id.* at 1189 (citing *Restatement (Second) of Torts* § 548A comments a, b). In this case, any link between the alleged violations and the injury is at best remote and tenuous. The alleged predicate acts were all directed at third parties, the rate bureaus, the ICC, and customers. Any harm from the alleged conspiracy would be purely contingent on how the rate bureaus and the ICC acted based on the alleged predicate acts and then the customers' taking action based on the ICC action. "The general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Holmes v. Securities Investor Protection Corp.,* — U.S. —, —, 112 S.Ct. 1311, 1319, 117 L.Ed.2d 532 (1992) (citations and footnote omitted). Lifschultz is, at best, the second step from the alleged predicate acts, and more probably is best described as three or four steps removed from the alleged predicate acts. "Allowing suits by those injured only indirectly would open the door to massive and complex damages litigation, which would not only burden the courts, but also undermine the effectiveness of treble-damages suits." *Id.* — U.S. at —, 112 S.Ct. at 1321 (citation omitted). Accordingly, the court finds that the alleged predicate acts were not the proximate cause of Lifschultz's injuries and summary judgment must be entered.

### 1. Detrimental reliance

■ The defendants' have specifically argued that Lifschultz has not alleged a sufficient causal connection between the RICO predicate acts of mail and wire fraud and its injuries. In relation to the proximate cause of an injury based on a RICO predicate act of mail fraud, the United States Court of Appeals for the Fourth Circuit has stated that "while ... it is not necessary to establish detrimental reliance

---

**27.** Although the court grants summary judgment as to the RICO claims based on the lack of evidence of racketeering activity, the court will address some of the other arguments as alternate grounds upon which summary judgment should be granted.

by the victim in order to make out a violation of the federal mail fraud statute, such reliance is necessary to establish injury to business or property 'by reason of' a predicate act of mail fraud...." *Brandenburg v. Seidel*, 859 F.2d 1179, 1188 n. 10 (4th Cir.1988); *Morley v. Cohen*, 888 F.2d 1006, 1011 (4th Cir.1989); *See also Professionals, Inc. v. Berry*, 959 F.2d 231 (4th Cir. 1992) (table; text found in Westlaw, 1992 WL 64796).[28] Because the alleged mail and wire fraud was directed at the rate bureaus and at customers or prospective customers, Lifschultz did not detrimentally rely on any representations. Lifschultz asserts that *Brandenburg* merely requires reliance by "someone" and that reliance need not be by the plaintiff. Lifschultz contends that the reliance by the rate bureau is sufficient. The court disagrees. In support of the assertion that Lifschultz did not need to rely, Lifschultz cites *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475 (5th Cir.1986); *SJ Advanced Technology & Mfg Corp. v. Junkunc*, 627 F.Supp. 572 (N.D.Ill.1986); and *Pearlstine Distributors, Inc. v. Freixenet, U.S.A., Inc*, 678 F.Supp. 133 (D.S.C.1988).[29] Although each of these cases appears to allow a RICO claim when the alleged misrepresentations were made to and relied upon by a third party, the court finds that these cases do not state the law of the Fourth Circuit as it presently exists. The language from *Brandenburg* states that "detrimental reliance by the victim" is not necessary to present a violation of the mail fraud statute. *Brandenburg*, 859 F.2d at 1188 n. 10; *Morley*, 888 F.2d at 1011. The language then provides that "such reliance" is necessary to establish a civil RICO claim based upon the predicate acts of mail fraud. *Brandenburg*, 859 F.2d at 1188 n. 10; *Morley*, 888 F.2d at 1011. It is clear from this language that "such reliance" refers to "detrimental reliance by the victim." Therefore, Lifschultz, as the alleged victim, must establish that it detrimentally relied on some representation by the defendants. *See Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1074 (D.Md.1991) (holding that the person allegedly deceived by the misrepresentation must be the person injured by the misrepresentations). Because Lifschultz has not and cannot demonstrate detrimental reliance, it cannot show injury to business or property "by reason of" the alleged predicate acts of mail and wire fraud.

Even if the court were to adopt Lifschultz's interpretation of the language from *Brandenburg*, Lifschultz has failed to establish the necessary reliance. *Brandenburg* clearly states a requirement for "detrimental" reliance. Even if false statements were made and even if the rate bureaus and the ICC relied upon these statements, Lifschultz has presented no evidence how this reliance was detrimental to the rate bureaus or the ICC. For these reasons, summary judgment must be granted as to the RICO claims insofar as they rely on predicate acts of mail and wire fraud.

### 2. Causation for § 1962(a)

Lifschultz cites *Ouaknine v. MacFarlane*, 897 F.2d 75 (2d Cir.1990) for the proposition that it does not need to show that its injury resulted from the alleged predicate acts to show a violation of § 1962(a). This is a mischaracterization of the holding in *Ouaknine*. *Ouaknine* adopted the "investment use" rule and held that "to state a claim for civil damages under § 1962(a), a plaintiff must allege injury from the defendants' investment of racketeering income in an enterprise." *Id.* at 83. In reaching this holding, the Second

---

**28.** The citation to an unpublished case is disfavored. Fourth Circuit I.O.P. 36.5. Nevertheless, because of the lack of published case law involving this issue of detrimental reliance and because *Professionals, Inc. v. Berry* is instructive in the interpretation of this issue, the court finds that citation to *Berry* is appropriate. The text of the *Berry* opinion can also be found at 1992 U.S.App.Lexis 6219.

**29.** Only *Pearlstine* is from the Fourth Circuit. Also, *Pearlstine* was decided prior to *Brandenburg*, and the question of whether reliance was required was not the focus of that court. The court in *Pearlstine* dismissed the RICO claims for a failure to properly allege two predicate acts of racketeering activity because of a failure to plead with particularity. *Pearlstine*, 678 F.Supp. at 138.

Circuit expressly rejected the argument that "a plaintiff asserting a claim for damages under § 1962(a) need allege injury only from the predicate acts, not from the defendants' investment of racketeering income." *Id.* at 82. The Fourth Circuit has rejected the "investment use" rule. *Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir.1990) (holding that a claim under § 1962(a) may be maintained by merely showing an injury from the RICO predicate acts). Therefore, the court finds that *Ouaknine* is completely inapplicable to this case.

However, even if Lifschultz can properly assert a § 1962(a) claim without demonstrating any injury from the predicate acts, Lifschultz is required to demonstrate that it was injured by reason of a violation of § 1962(a). Lifschultz has failed to produce any evidence which demonstrates that the defendants illegally obtained any income through racketeering activity or that the defendants invested any such income in an enterprise. Therefore, Lifschultz cannot show that the defendants violated § 1962(a), much less that it was injured by reason of such a violation. For this reason, summary judgment must be entered as to the § 1962(a) claim.

## C. *McNally*

The defendants further assert that they are entitled to summary judgment because Lifschultz has failed to demonstrate that the alleged predicate acts of mail and wire fraud were part of a scheme to defraud which was intended to deprive another of money or property. *See McNally v. United States*, 483 U.S. 350, 358–61, 107 S.Ct. 2875, 2880–82, 97 L.Ed.2d 292 (1987).[30]

**30.** The holding of *McNally* was limited by Congress in 18 U.S.C. § 1346, which allows an action based on a scheme to deprive another of the intangible right of honest service. Nevertheless, the claims in this case are governed by *McNally* because the statute did not become effective until after these RICO claims were brought and § 1346 has no retroactive effect. *See Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1417 n. 4 (3d Cir.1991); *United States v. Telink, Inc.*, 910 F.2d 598, 601 n. 2 (9th Cir.1990); *United States v. Granberry*, 908 F.2d

### 1. Government property

The primary objects of the alleged predicate acts of mail and wire fraud were the rate bureaus and the ICC. The defendants contend that the rate bureaus and the ICC were not deprived of any property interest, but at most were deprived of an intangible interest, as regulators, in properly regulating the trucking industry. This interest in proper regulation is not a sufficient deprivation of property under the wire and mail fraud statutes. *See McNally v. United States*, 483 U.S. 350, 356–59 & n. 8, 107 S.Ct. 2875, 2879–81 & n. 8, 97 L.Ed.2d 292 (1987) (the mail fraud statute does not protect the "intangible right of the citizenry to good government"; and "any benefit which the Government derives from the statute must be limited to the Government's interests as property holder."); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 792–93 (1st Cir.1990) (representations to the air industry's self-regulatory associations to induce regulatory action did not constitute a deprivation of property under the mail and wire fraud statutes); *United States v. Evans*, 844 F.2d 36, 42 (2d Cir.1988) ("the United States's [sic] interest in regulating foreign resales of arms is not a property right for wire and mail fraud purposes."); *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1071–73 (D.Md.1991) (FDA's interest in approving and regulating new drugs is not property within the meaning of the federal mail and wire fraud statutes.). Therefore, to the extent that Lifschultz's allegations of mail and wire fraud rely on the defendants' defrauding the rate bureaus and the ICC, they are not sufficient, and summary judgment must be granted.

278, 281 n. 1 (8th Cir.1990); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.*, 904 F.2d 786, 791 (1st Cir.), *cert. denied* — U.S. —, 111 S.Ct. 536, 112 L.Ed.2d 546 (1990); *Lomelo v. United States*, 891 F.2d 1512, 1514 n. 6 (11th Cir.1990); *United States v. Bush*, 888 F.2d 1145, 1146 (7th Cir.1989); *Corcoran v. American Plan Corp.*, 886 F.2d 16, 19 (2d Cir.1989); *United States v. Davis*, 873 F.2d 900, 902 (6th Cir.), *cert. denied* 493 U.S. 923, 110 S.Ct. 292, 107 L.Ed.2d 271 (1989); *United States v. Stewart*, 872 F.2d 957, 960 n. 2 (10th Cir.1989).

### 2. Convergence of deceived and injured

 The defendants argue that, under *McNally*, a violation of the mail and wire fraud statutes is shown only when property is obtained from the person who is deceived. " 'If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived person must lose money or property.' That is, there must be a convergence of the deceived and the injured." *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F.Supp. 1053, 1073 (D.Md.1991) (quoting *United States v. Evans*, 844 F.2d 36, 39 (2d Cir.1988); citation and footnote omitted);[31] *See also United States v. Lew*, 875 F.2d 219, 221 (9th Cir.1989) ("the Court made it clear [in *McNally*] that the intent must be to obtain money or property from the one who is deceived"); *United States v. Shelton*, 848 F.2d 1485, 1495 (10th Cir.1988) ("Under *McNally*, instructions on the elements of mail fraud must require the jury to find that the victim of the scheme was *itself* defrauded of money or property." (emphasis in original)); *United States v. Keane*, 678 F.Supp. 708, 711 (N.D.Ill.1987), *aff'd* 852 F.2d 199 (7th Cir.1988), *cert. denied* 490 U.S. 1084, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989) ("*McNally* serves to tighten up the concept of 'victim.' That is, to constitute fraud, the entity to be deceived must *also* be the entity that is to part with property." (emphasis in original)).

This reasoning is not universally accepted. Lifschultz argues that the person deceived is not required to be the same party from whom the property is obtained. In support of this argument, it cites *Armco Indus. Credit Corp. v. SLT Warehouse Co.*, 782 F.2d 475, 482 (5th Cir.1986) (stating that "the intended victim need not even have been defrauded for liability to attach under the mail fraud statute.") and *Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F.Supp. 926, 947 (S.D.N.Y.1989) (finding that communications made among defendants or their employees were sufficient to support mail and wire fraud).

This court finds that the better reasoned rule is to require a convergence of the identity of the injured and the deceived. That is, the person allegedly injured by the misrepresentations must be the person allegedly deceived by the misrepresentations. Also, the language in *Brandenburg*, which requires detrimental reliance on the part of the victim, supports this rule. *Brandenburg*, 859 F.2d at 1188 n. 10; *Morley*, 888 F.2d at 1011. Therefore, because there is no convergence of the deceived and the injured in this case, summary judgment must be granted as to Lifschultz's RICO claims which are based on allegations that it was injured by the defendants' submission of information to the rate bureaus, the ICC, or customers.

## V. *KEOGH* DOCTRINE

 The defendants assert that they are entitled to summary judgment because the *Keogh* doctrine[32] bars Lifschultz's claims. The *Keogh* doctrine bars collateral attack of tariffs subject to ICC regulation. In *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), the Court held that the extensive regulatory structure of the Interstate Commerce Act provides the damage remedies for those aggrieved by regulated carrier rate-making, so that a private anti-trust action was not allowed. *Id.* at 161–62, 43 S.Ct. at 49. The Court stated four reasons for this holding. First, when the ICC determines that a rate is illegal or unreasonable, the injured party can recover damages under the Interstate Commerce Act. *Id.* at 162, 43 S.Ct. at 49. Second, the Interstate Commerce Act was intended to prevent unjust discrimination, and to allow recovery under antitrust laws might defeat this purpose by giving the recovering party an advantage over his competition. *Id.* at 163, 43 S.Ct. at 49. Third, an anti-trust plaintiff would

---

**31.** Although this theory was not the basis of the holding in *Evans*, the language is instructive.

**32.** At times the parties refer to the "filed rate doctrine." The *Keogh* doctrine is a more specific statement of the filed rate doctrine. The *Keogh* doctrine applies to rates filed with the ICC. The "filed rate doctrine" applies to rates filed with any regulatory body. For purposes of this order, the court uses the terms interchangeably.

have to show that the ICC would have approved the rate that he asserts would have prevailed without the alleged anticompetitive activity. *Id.* at 163–64, 43 S.Ct. at 49–50. Finally, the amount of a plaintiff's damages are speculative. *Id.* at 164, 43 S.Ct. at 50. Under the filed rate doctrine, tariffs filed with the ICC are binding, have the force of law, and are lawful for all purposes, unless declared unlawful or unreasonable by the ICC. *Id.* at 163, 43 S.Ct. at 49. Although the validity of the *Keogh* doctrine has been questioned, recently it has been affirmed and applied in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986) and *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).

### A. Fraudulent Manipulation

 Lifschultz asserts that the *Keogh* doctrine does not apply in this case because it is challenging the "fraudulent manipulation of the ICC," and not the rates. Lifschultz's injuries did not result from the alleged acts of fraudulent manipulation. The injuries allegedly occurred as a result of the defendants' and Lifschultz's charging rates that were set and tariffs that were filed based on the fraudulent information. It is clear to the court that Lifschultz is attempting to collaterally attack the lawfulness or reasonableness of the rates. This is exactly what the *Keogh* doctrine was created to prevent. The fact that the rates were allegedly set based on fraudulent information is immaterial. Even when a rate is allegedly fraudulently obtained, the filed rate doctrine applies. *Taffet v. Southern Co.,* 967 F.2d 1483, 1494 (11th Cir.1992); *See also H.J. Inc. v. Northwestern Bell Tel. Co.,* 954 F.2d 485 (8th Cir.1992), *cert. denied* ⸻ U.S. ⸻, 112 S.Ct. 2306, 119 L.Ed.2d 228 (1992).

### B. Action by Competitor

 Lifschultz also argues that the filed rate doctrine applies only in actions between a carrier and a customer. It cites

*Groton v. Connecticut Light & Power Co.,* 662 F.2d 921 (2d Cir.1981) (refusing to apply the *Keogh* doctrine to an action by a competitor because the *Keogh* case involved an action by a customer) and *Essential Communications Systems, Inc. v. American Telephone & Telegraph Co.,* 610 F.2d 1114 (3d Cir.1979) (refusing to apply the *Keogh* doctrine because the FCC tariff was not intended to protect competitors).[33] The Sixth Circuit, however, in a well reasoned opinion, has determined that the *Keogh* doctrine can apply in actions between competitors. *Pinney Dock & Transport Corp. v. Penn Central Corp.,* 838 F.2d 1445 (6th Cir.), *cert. denied* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). This position is further supported by the fact that in *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 65 S.Ct. 716, 89 L.Ed. 1051 (1945), the Court applied the *Keogh* doctrine in a case in which Georgia was both a customer and a competitor.

In *Pinney,* the Sixth Circuit points out that three of the four reasons for the *Keogh* doctrine favor the application of the doctrine to actions by competitors as well as customers. *Pinney,* 838 F.2d at 1457. In determining the reasonableness of rates, the ICC must not only protect against a carrier's overcharging a captive customer, but it must also consider the economic costs of the transportation service. The ICC, therefore, is the sole source of any rights relating to an injury caused by a filed rate for not only customers, but for the entire public, including competitors. *See Pinney* at 1457. Lifschultz had the right under the Interstate Commerce Act to complain to the ICC that the rates were illegal and unreasonable. It chose not to pursue that right. Lifschultz also would be required at trial to show that the rate that would have prevailed without the alleged conspiracy would have been approved by the ICC and that such a rate would not have injured Lifschultz. Additionally, the amount of damage that is attributable to the rates being allegedly set by the defen-

---

**33.** *Groton* involved an electrical utility, and *Essential Communications* involved the telephone communications industry. It should be noted that at the time of these cases, the plaintiffs had no other competitors than the defendant in each case.

dants' submitting fraudulent information would be completely speculative. These are the exact problems that the Court in *Keogh* foresaw and sought to avoid. The court, therefore, finds that the filed rate doctrine applies to actions by competitors as well as customers.

## C. *Keogh* and RICO

 Lifschultz next argues that the *Keogh* doctrine does not apply to its RICO claims. It asserts that the *Keogh* doctrine applies only to anti-trust actions. Lifschultz cites *County of Suffolk v. Long Island Lighting Co.*, 907 F.2d 1295 (2d Cir.1990) [34] as support for this argument. *LILCO*, however, addressed the "clear statement doctrine" [35] not the filed rate doctrine. The court, therefore, finds *LILCO* inapplicable to the facts of this case.

 To support their argument that the *Keogh* doctrine applies to RICO claims, the defendants cite *H.J. Inc. v. Northwestern Bell Tel. Co.*, 954 F.2d 485 (8th Cir.1992) (holding that the filed rate doctrine does apply in a RICO action). Also, the court finds persuasive the case of *Taffet v. Southern Co.*, 967 F.2d 1483 (11th Cir. 1992) which holds that the filed rate doctrine applies to a RICO claim. Based on the reasoning of *H.J. Inc.* and *Taffet*, the court finds that the *Keogh* doctrine applies to bar RICO claims.

Based on the foregoing, the court finds that the *Keogh* doctrine bars Lifschultz's anti-trust claim and RICO claims. Summary judgment must be granted as to those claims.

## VI. SCUTPA

Lifschultz has asserted a claim under the SCUTPA alleging that the defendants used unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce in violation of S.C.Code Ann. § 39–5–20 (Law.Co-op.1976).

**34.** This case is referred to as *LILCO*.

**35.** The clear statement doctrine requires a clear statement from Congress before the federal courts assume that Congress intended to alter

## A. Public Interest

 The defendants assert that Lifschultz has failed to demonstrate that the alleged unfair or deceptive practices "affect the public interest" as required by *Noack Enterprises, Inc. v. Country Corner Interiors, Inc.*, 290 S.C. 475, 351 S.E.2d 347 (Ct.App.1986). A disappointed competitor unable to show harm to competition from the alleged deceptive and unfair trade practices does not have a claim. *Steuer v. National Medical Enterprises, Inc.*, 672 F.Supp. 1489, 1521–22 (D.S.C. 1987). Nevertheless, "a finding of conspiracy to restrain competition is tantamount to a finding that the underlying conduct has 'an impact upon the public interest.'" *Omni Outdoor Advertising, Inc. v. Columbia Outdoor Advertising, Inc.*, 891 F.2d 1127, 1143 (4th Cir.1989), *rev'd on other grounds sub nom. City of Columbia v. Omni Outdoor Advertising, Inc.*, ––– U.S. –––, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). Lifschultz argues that its allegations of conspiracy are sufficient to create a question of fact as to the SCUTPA claim. The court does not agree. The court has previously ruled that there is not sufficient evidence for a rational jury to find a conspiracy to restrain trade. Therefore, all that is present in this case is a disappointed competitor with no impact upon the public interest. Additionally, the court finds that Lifschultz has failed to present evidence that any acts committed by the defendants were unfair or deceptive in any way. For these reasons, summary judgment must be granted as to the SCUTPA claim.

## B. *Keogh* Doctrine

 The defendants assert that the *Keogh* doctrine applies to bar Lifschultz's SCUTPA claim. Neither the defendants nor Lifschultz have cited a case in which a court has applied the *Keogh* doctrine to bar a state law claim or refused to apply the

the usual constitutional balance of power in areas "traditionally regulated by the States." *Hilton v. South Carolina Public Ry. Comm'n*, ––– U.S. –––, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991).

*Keogh* doctrine, thus allowing the state law claim. The court finds the rationale for the *Keogh* doctrine[36] applies to the SCUTPA claims as well as to anti-trust claims and RICO claims. First, the Interstate Commerce Act provides an adequate remedy to Lifschultz. Second, Lifschultz would be required to show that it was harmed by the rates that were set and that the ICC would have approved rates that would not have harmed Lifschultz if the alleged deceptive acts had not occurred. Finally, Lifschultz's damages would be speculative. Therefore, the SCUTPA is barred by the *Keogh* doctrine, and summary judgement must be granted.

## VII. SUMMARY JUDGMENT STANDARD

In ruling on a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, the court must view the facts in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986) (emphasis in original). Only disputes over facts that might affect the outcome of the suit will be considered material so as to preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510. Also, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

It is clear that the moving party bears the burden to show that there is no genuine issue of material fact. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Nevertheless, "Rule 56(e) itself provides that a party opposing a properly supported motion for summary judgment may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Id.* "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252, 106 S.Ct. at 2512. Also, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. at 2511 (citations omitted). In relation to the sufficiency of the evidence, the Supreme Court has stated that:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

The party against whom summary judgment is sought "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. "A

---

**36.** The rationale behind the *Keogh* doctrine is stated in section V of this opinion.

trial, after all, is not an entitlement. It exists to resolve what reasonable minds would recognize as real factual disputes." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

In the case *sub judice,* Lifschultz has charged the defendants with seriously egregious conduct, alleged to have occurred for a period of at least twenty-five (25) years. The conspiracy as alleged by Lifschultz is of monstrous proportions. Although the parties have undertaken extensive discovery, Lifschultz has been unable to produce plausible evidence that supports its allegations. In deciding whether there is an issue of material fact, the court has considered "the record taken as a whole." In contrast with the length and breadth of the alleged conspiracy, the evidence which allegedly supports Lifschultz's position is simply insufficient to raise a genuine question of material fact.

## VIII. CONCLUSION

Based on the foregoing, the court hereby grants the defendants' motions for summary judgment as to all causes of action and grants the defendants' motion to exclude testimony.

IT IS SO ORDERED.