**OCEAN LOGISTICS MANAGEMENT, INC., Plaintiff,**

v.

**NPR, INC., d/b/a Navieras, et al., Defendants.**

No. Civ. 96–2388 DRD.

United States District Court, D. Puerto Rico.

Feb. 26, 1999.

---

Rick A. Rude, Fall Church, VA, Luis N. Saldana–Roman, Saldana & Caravajal, San Juan, PR, for Plaintiff.

Amy Loeserman–Klein, Bethesda, MD, Rafael R. Vizcarrondo, Fiddler, Gonzalez & Rodriguez, San Juan, PR, for Defendants.

### OPINION AND ORDER

DOMINGUEZ, District Judge.

Pending before this Court is Defendants', NPR, Inc. d/b/a Navieras, et al. ("NPR"), Motion to Dismiss (Docket No. 10), pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss counts 1, 2, 3, and 5 of the Plaintiff's, Ocean Logistics Management, Inc. ("OLMI"), First Amended Complaint (Docket No. 4). NPR seeks dismissal on the ground that the "filed-rate doctrine" and applicable federal transportation statutes have preempted plaintiff's causes of action arising under local law, common law, or other federal statutes. In addition, NPR argues that under the doctrine of primary jurisdiction, exclusive jurisdiction

to determine the legality of the actions complained of lies with the Surface Transportation Board ("STB"), an agency established by Congress in the ICC Termination Act of 1995 ("Termination Act"), 49 U.S.C.App. § 10101 *et seq.*[1]

Plaintiff OLMI filed a timely Opposition (Docket No. 15) and a Supplemental Brief in Opposition to NPR's motion to dismiss (Docket No. 19), to which NPR replied (Docket Nos. 21, 39). Plaintiff then filed a Supplemental Memorandum (Docket No. 22) in further support of its Opposition, which itself triggered a Response from NPR (Docket No. 24), a Surreply by OLMI (Docket No. 26) and a further Response by NPR (Docket No. 29). The Court heard oral arguments on these motions on February 6, 1998. At the Court's direction (Docket No. 40), the parties submitted proposed opinions and order forms. Subsequently, via an informative motion (Docket No. 42), NPR brought to the Court's attention a recent U.S. Supreme Court decision, *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998), issued on June 15, 1998. OLMI filed a response (Docket No. 43), to which NPR replied (Docket No. 47). After all of the filings above and the hearing, the dust has settled and the Court

proceeds to rule on the pending request for dismissal. For the reasons set forth below, the Court finds that Counts 1, 2, 3, and 5 of Plaintiff's First Amended Complaint are preempted by the filed-rate doctrine, and as such are dismissed.[2]

## I. BACKGROUND

The essential facts which give rise to the motion to dismiss are briefly narrated. We accept "as true all well-pleaded factual averments and indulging all reasonable inferences in the plaintiff's favor," mindful that dismissal is appropriate if the facts alleged, taken as true, do not justify recovery. *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir.1996); *Brown v. Hot, Sexy And Safer Productions, Inc.*, 68 F.3d 525, 530 (1st Cir.1995); *Conley v. Gibson*, 355 U.S. 41, 45-6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Miranda v. Ponce Fed. Bank*, 948 F.2d 41, 44 (1st Cir.1991).

In February 1996, NPR,[3] a common carrier, and OLMI, a shipper, entered into an 11–month Time Volume Agreement ("TVA").[4] In this specific TVA, OLMI guaranteed that it would ship on NPR's vessels not less than 1900 Refrigerated Containers and 185 dry containers, during the period between February 2, 1996 through December 31, 1996, to be carried

---

**1.** The Court notes that although NPR invokes Fed.R.Civ.P. 12(b)(6) in support of its request for dismissal, the challenge to the Court's jurisdiction over plaintiff's claims, based upon the doctrine of primary jurisdiction, is more properly characterized as raising a defense of lack of subject matter jurisdiction under Fed. R .Civ.P. 12(b)(1). *See e.g., Liquilux Gas Corp. v. Martin Gas Sales*, 771 F.Supp. 502 (D.P.R.1991), *aff'd.*, 979 F.2d 887 (1st Cir. 1992). However, because the standards are the same, the distinction is inconsequential. *See Negron–Gaztambide v. Hernandez–Torres*, 35 F.3d 25, 27 (1st Cir.1994).

**2.** Although Counts 1, 2, 3, and 5 of Plaintiff's First Amended Complaint are dismissed, the Plaintiff is not left without a remedy. The Court is cognizant of Plaintiff's submission of a Complaint and Petition for Declaratory Order to the STB, via Informative Motion (Docket No. 49, Exhibit 1). Similarly after a case

which was dismissed upon similar grounds (i.e., filed-rate doctrine preempted that court's jurisdiction) by the Superior Court of Puerto Rico, San Juan, a Plaintiff in an analogous position initiated an action before the FMC, which ruled in their favor. *Mar–Mol Co. and CopyCorp v. Sea Land Servs., Inc.*, FMC Dkt. No. 95–11, 27 S.R.R. 850 (Init. Dec., 1996).

**3.** NPR is a privately-owned steamship company whose predecessor was the former government-owned company, the Puerto Rico Maritime Shipping Authority.

**4.** Under a Time Volume Agreement or "TVA", the shipper commits to ship with the carrier a minimum quantity of containers over a specified period of time. In return for this commitment, the carrier guarantees the shipper that the rate charged for each shipment will not change during that period of time.

from specified ports in the United States to San Juan, Puerto Rico. (Docket No. 4, Complaint, Ex. 1). In exchange, NPR would charge OLMI the sum of $3700 for each container minus a trucking allowance of $300 for trucking services to be performed by OLMI, who also operates as a motor carrier in the continental United States. This rate was lower than the rate charged by NPR in its filed tariffs applicable to shipments of Refrigerated Containers tendered without volume guarantees.

The TVA, as OLMI openly admits, is a maritime contract duly executed by both parties. Therein, it is stated that "OLMI will be governed by all applicable Rules and Regulations as published in NPR Inc.'s Tariffs No. 211–C and 102–A." and that "THE BILL OF LADING MUST ALWAYS BE CLAUSED WITH THE ASSIGNED TARIFF ITEM NUMBER AND TARIFF AUTHORITY." (Docket No. 4, Complaint, Ex. 1). NPR made all of the filings required to publish the rates agreed to in the TVA in its tariffs on file with the STB. By filing those rates in its tariff, NPR necessarily made them available to any other shipper who would meet the minimum quantity and the terms and conditions of carriage set forth in NPR's tariffs pertaining to Time Volume Agreements.

In its First Amended Complaint, OLMI claims that on October 8, 1996 NPR "unilaterally and without just cause cancel[ed] the TVA effective the next morning." (Docket No. 4, Complaint, Ex. 1). OLMI utilizes the term "canceling" loosely because there is no allegation that NPR failed to honor the reduced TVA rates or any other provision of that contract. What can be gleaned from OLMI's pleadings and motions on file is OMLI alleges that actions by NPR regarding its shipping rates were tantamount to a constructive cancellation or termination of the TVA. According to OLMI, on October 8,

1996, representatives of NPR met with representatives of OLMI to inform them that NPR had determined to change the rates in its tariffs which applied to the shipment of Refrigerated Containers tendered without any guarantees of minimum quantity. These rates are known in the shipping trade as Any Quantity rates (a.k.a. "AQ" rates, hereinafter referred to as such). The publication of the new AQ rates eliminated the price differential that OLMI had previously enjoyed, and allegedly destroyed the market OLMI had built up in marketing NPR's service for the transportation of refrigerated containers.

In the First Amended Complaint, OMLI claims five causes of action: (1) breach of maritime contract; (2) breach of a distribution contract under Law No. 75 of June 24, 1964, 10 L.P.R.A. § 278, et. seq., as amended; (3) tortious interference with the contractual relations of others; (4) collection of outstanding commissions and trucking allowances; and (5) violations of the Sherman Act, 15 U.S.C. §§ 1 and 2. (Docket No. 4).

The crux of defendant NPR's motion to dismiss is the issue of whether the applicable federal transportation statutes have preempted these causes of action allegedly arising under local law, the Civil Code (under contract, tort or other substantive law theories), or even under other federal statutes. Not surprisingly, a determination of that issue rests upon an analysis of the applicable transportation statutes, and the precedents establishing the parameters of federal preemption in that context. It is to that analysis that the Court turns.[5]

## II. MOTION TO DISMISS STANDARD

It is well-settled law that in ruling upon a 12(b)(6) motion, the Court must:

"[A]ccept the allegations of the complaint as true and determine whether

---

5. NPR also invokes the doctrine of primary jurisdiction. As it will become evident in our discussion, this Court finds it is unnecessary to address the applicability of this doctrine to the instant case.

under any theory, the allegations are sufficient to state a cause of action in accordance with the law (citations omitted) ... because only well pleaded facts are taken as true, we will not accept a complainant's unsupported conclusions or interpretations of law."

*Brown v. Hot, Sexy and Safer Productions, Inc.,* 68 F.3d 525, 530 (1st Cir.1995); *See also Washington Legal Found. v. Massachusetts Bar Found.,* 993 F.2d 962, 971 (1st Cir.1993); *Vartanian v. Monsanto Co.,* 14 F.3d 697, 700 (1st Cir.1994).

■ Notwithstanding this "highly deferential standard," a court must not accept any unsupported conclusions or interpretations of law. *Washington Legal Found.,* 993 F.2d at 971. As the First Circuit Court of Appeals has taught, "[i]n the menagerie of the Civil Rules, the tiger patrolling the courthouse gates is rather tame, but not entirely ... toothless." *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 52 (1st Cir.1990). Accordingly, in weighing the sufficiency of plaintiff's allegations, this Court must "carefully balance the rule of simplified civil pleading against the need for more than conclusory allegations." *Washington Legal Foundation,* 993 F.2d at 971.

In *Day v. Fallon Community Health Plan, Inc.,* 917 F.Supp. 72, 75 (D.Mass. 1996), a district court solved the " 'often blurred' line between sufficient facts and insufficient conclusions" by applying the general parameters outlined in *Dartmouth Review v. Dartmouth College,* 889 F.2d 13, 16 (1st Cir.1989):

Most often, facts are susceptible to objective verification. Conclusions, on the other hand, are empirically unverifiable in the usual case. They represent the pleader's reactions to, sometimes called "inferences from," the underlying facts. It is only when such conclusions are logically compelled, or at least supported, by the stated facts, that is, when the suggested inference rises to what experience indicates is an acceptable level of probability, that "conclusions" become "facts" for pleading purposes.

*Day,* 917 F.Supp. at 75.

Plaintiff is therefore not immune to dismissal at an early stage if the facts do not comply with the following standard: "it is the plaintiff's burden to make sufficient factual allegations in order to survive a Rule 12(b)(6) motion. This Court need not 'conjure up unpled allegations or contrive elaborately arcane scripts' in order to allow the plaintiff's Complaint to survive at this early stage of the litigation." *Day,* 917 F.Supp. at 75 (citing *Gooley v. Mobil Oil Corp.,* 851 F.2d 513, 514 (1st Cir.1988)). Finally, although all inferences must be made in the Plaintiff's favor, this Court need not accept "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Aulson,* 83 F.3d at 3.

## III. SUBSTANTIVE HISTORY OF REGULATION

Prior to January 1, 1996, three federal statutes regulated transportation in the trade between the United States and Puerto Rico, sometimes referred to as the "domestic offshore" trade or the "noncontiguous domestic" trade. The Shipping Act, 1916, 46 U.S.C.App. § 801 *et seq.,* and the Intercoastal. Shipping Act, 1933, 46 U.S.C.App. § 843 *et seq.* together set forth a comprehensive system of regulation, which imposed upon steamship companies in the domestic trades the duty to file all of their rates with the Federal Maritime Commission ("FMC") and the concomitant obligation to charge *only* the filed rates. These statutes also imposed substantial penalties for a carrier's failure to abide by its filed tariffs.

Until 1979, shipping between the United States and Puerto Rico was regulated only pursuant to these two acts and by the agency created thereunder, the FMC. In that year, the Court of Appeals for the District of Columbia Circuit held that the Interstate Commerce Commission ("ICC") had tariff filing and substantive regulatory

jurisdiction over both the rail and water segments of joint through inland/water intermodal rail service in domestic offshore commerce. *Trailer Marine Transp. Corp. v. F.M.C.*, 602 F.2d 379 (D.C.Cir.1979). Two years later, the same appellate court made the same ruling in respect of joint through inland/water intermodal motor carrier service. *Puerto Rico Maritime Shipping Auth. v. I.C.C.*, 645 F.2d 1102 (D.C.Cir.1981). Therefore, from 1979 until the enactment of the Termination Act in 1995, two federal agencies, with differing statutes and regulations, regulated the ocean trade between the continental United States and Puerto Rico: the FMC had jurisdiction over port-to-port traffic, and the ICC had jurisdiction over joint through intermodal traffic. Under both systems, carriers were obligated to file their rates with the appropriate regulatory agency. A violation of law occurred when the carriers charged anything other than the filed rates. *See, e.g. Maislin Industries, U.S. Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990).

The Termination Act abolished the ICC, 49 U.S.C.App. § 701 note, created the STB as a new agency within the Department of Transportation, 49 U.S.C.App. § 701, and transferred to the STB *both* "the current ICC jurisdiction over transportation by motor carriers" *See* (ICC Termination Act of 1995, *Conference Report* (Report No. 104–422, 104th Cong., 1st Sess. p. 201)); 49 U.S.C. § 13501, *and* all intermodal and port-to-port jurisdiction in domestic offshore commerce previously exercised by the two agencies referred to above, the FMC and the ICC:

"This section [§ 13521] transfers to the Secretary [of Transportation] and the Panel [renamed the STB] the current jurisdiction over water carrier transportation. The jurisdiction has been expanded to include port-to-port water carrier transportation and transportation to the U.S. territories." *Conference Report, Ibid.*, p. 203.

Like its predecessor legislation, the Termination Act requires water carriers in the noncontiguous domestic trades like NPR, and motor carriers entering into joint through intermodal rates with such water carriers, to file their rates with the regulatory agency. 49 U.S.C. § 13702. Further, a specific provision permits the filing of rates which may vary according to the volume committed, called time volume rates. 49 U.S.C. § 13702(b)(4). NPR and OLMI agreed to one such time volume rate in their TVA. The Termination Act also prescribes severe penalties for any carrier and/or shipper who deviates from its obligation to charge and collect only their previously filed rates. 49 U.S.C. §§ 14902–14904. The Termination Act requires that all rates and practices in the noncontiguous domestic trades be reasonable, 49 U.S.C. § 13701, and provides a mechanism for the filing of complaints before the STB by anyone who avers that a carrier is in violation of this standard. 49 U.S.C. § 13702(b)(6).

This brief overview of the comprehensive, and at the same time, complex nature of the regulatory scheme created by Congress provides the proper context, in the opinion of the Court, within which this case must be scrutinized. It is clear and beyond dispute, for example, that both plaintiff OLMI and defendant NPR are entities regulated by the provisions of the Termination Act, and that the actions or omission of NPR that OLMI are covered under the federal regulatory scheme. This determination is critical, disposing of a substantial portion of OLMI's arguments.

## IV. FILED–RATE DOCTRINE

We turn to a discussion of the filed-rate doctrine for various reasons, namely because: (i) NPR relies on it in seeking dismissal of Counts 1, 2, 3 and 5 of the First Amended Complaint; (ii) OLMI downplayed its importance and its continued applicability and force during oral argument; and (iii) because at the end of last

term (i.e., 1997–1998), the United States Supreme Court reversed a decision by the Court of Appeals for the Ninth Circuit and ordered the dismissal of a complaint whose facts and legal contours are remarkably similar to those in the present case. *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.,* 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998).

The filed-rate doctrine was developed from a number of opinions of the United States Supreme Court involving lawsuits by shippers against common carriers subject to the rate-filing requirements existing under several federal statutes, including those now found in the Termination Act. Two seminal Supreme Court cases establish the jurisdictional consequences arising from these rate-filing requirements. Each case holds, in different contexts, that causes of action based upon rates filed by carriers in the regulated transportation industries must be remitted to the regulating agencies created for exclusive application of the remedies established by Congress under the regulatory statutes.

The first case, *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907), held that common law actions based upon filed tariff rates were preempted by the Interstate Commerce Act; and that the shipper's exclusive remedy in an action based on the theory that the rate paid was unreasonable must be filed at the Interstate Commerce Commission. While the Court agreed with plaintiff that such a cause of action ordinarily lay both under common law and under the terms of the Interstate Commerce Act, and that the Interstate Commerce Act expressly (1) preserved common law rights, and (2) gave persons injured by unreasonable rates a choice to sue in either a United States District Court or before the ICC, nevertheless the Court held that the shipper's *only* recourse was to bring suit before the regulatory agency which alone was empowered to determine the legality of the rate in question:

"Nor is there merit in the contention that [then] § 9 of the act compels to the conclusion that it was the purpose of Congress to confer power upon courts primarily to relieve from the duty of enforcing the established rate by finding that the same as to a particular person or corporation was so unreasonable as to justify an award of damages. True it is that the general terms of the section, when taken alone, might sanction such a conclusion, but, when the provision of that section is read in connection with the context of the act, and in the light of the considerations which we have enumerated, we think the broad construction contended for is not admissible."

*Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. at 441–42, 27 S.Ct. at 356.

The second leading Supreme Court case referred to above, and the one most cited as to the preemptive effect of the filed-rate doctrine, arose in the context of a suit based on the federal antitrust laws. In *Keogh v. Chicago & N.W. Ry. Co.,* 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922), the plaintiff shipper charged the defendant railroads with setting prices pursuant to an unlawful price-fixing conspiracy. The prices, however, were implemented by rates filed with the ICC. The Supreme Court held that no antitrust remedy could be imposed against a carrier who charged its filed rates, *even* if those rates were arrived at conspiratorially under clearly illegal antitrust price-fixing agreements in a non-regulatory context, as the plaintiff alleged. In particular, the Supreme Court reasoned:

"A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti–Trust Act. What rates are legal is determined by the Act to Regulate Commerce."

*Keogh,* 260 U.S. at 162, 43 S.Ct. at 49.

The "filed-rate doctrine", as this concept has come to be known, has accordingly

been held to preempt all complaints charging that rates filed with regulatory agencies under comprehensive regulatory systems are illegal, whether the illegality is said to be based on common law, state law, federal antitrust law, or other federal statutes. Indeed, the doctrine has survived numerous attempts to narrow its breadth or to shake its foundation. For example, in 1981, the Supreme Court re-affirmed the force of the preemption doctrine when states were barred from enforcing their own policies and laws in the federally regulated transportation context of filed rates:

"Since the turn of the century, we have frequently invalidated attempts by the States to impose on common carriers obligations that are plainly inconsistent with the plenary authority of the Interstate Commerce Commission or with congressional policy as reflected in the Act. These state regulations have taken many forms. For example, as early as 1907, the Court struck down a State's common-law cause of action to challenge as unreasonable a rail common carrier's rates because rate regulation was within the exclusive jurisdiction of the Commission, and a state-court action 'would be absolutely inconsistent with the provisions of the act.' *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 446, 27 S.Ct. 350, 357, 51 L.Ed. 553 [ (1907) ]."

*Chicago & N.W. Transp. v. Kalo Brick & Tile*, 450 U.S. 311, 318, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981).[6]

The Supreme Court's rationale in *Kalo Brick & Tile* is particularly apposite here, given that Count 2 of OLMI's suit is predicated on the argument that the filing of the AQ rates during the pendency of its TVA violated the protection provided to local distributors under Law 75. *See* P.R.LAWS ANN. tit. 10 § 278, et. seq.(1964). If OLMI were allow to assert the applica-

bility of the local Distributors Law, then NPR arguably would be precluded from varying the rates committed to in the TVA with OLMI originally for a period of 11 months in 1996, and from charging any of its other customers rates which might impact unfavorably upon OLMI's ability to market its TVA rates except by facing potential redress authorized under Law 75. *See* P.R.LAWS ANN. tit. 10 § 278b (1964). A court enforcing Law 75 to a TVA agreement would be legally bound to protect the shipper or freight forwarder against any tariff decision of the carrier which enhances competition in the trade but which, by definition, is harmful to the freight forwarder.[7] Moreover, Puerto Rico shippers would enjoy enhanced filed rates for longer periods and subject to considerable remuneration under Law 75 not available to other continental shippers. Under the Termination Act of 1995, however, the STB is expressly directed to *encourage* price competition in the domestic noncontiguous trades. 49 U.S.C. § 13101(a)(4). The teaching of the Supreme Court's holding in *Kalo Brick & Tile* is that this is *precisely* the potential for conflict between state policies, such as reflected in Law 75, and federal transportation policies, such as reflected in the Termination Act, which mandates the preemption of state causes of action.

*Keogh*, which in 1922 held federal antitrust laws preempted in respect of any actions involving rates filed with the ICC, is the leading case regarding the comprehensive preemptive effect of the filed-rate doctrine. Efforts to overturn *Keogh* or to narrow its application were firmly rejected by the Supreme Court in *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 106 S.Ct. 1922, 90 L.Ed.2d 413 (1986). In *Square D*, motor carriers were charged with filing rates in their tariffs which had not been the subject of any ICC

---

6. *See also G. & T. Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d 1230, 1234 (3d Cir.1987), *cert. denied*, 485 U.S. 988, 108 S.Ct. 1291, 99 L.Ed.2d 501 (1988).

7. Law 75 is designed to protect alleged distributor, regardless of the effect on competition or the market. *See generally* P.R.LAWS ANN. tit. 10 § 278, et. seq (1964).

investigation or specific approval, and which were alleged to have been arrived at through illegal price-fixing arrangements. The Supreme Court acknowledged that some commentators and judges, particularly those in the 2nd Circuit Court of Appeals, were in favor of limiting or overturning the filed-rate doctrine as broadly established by *Keogh;* the Court however, soundly rejected that course of action:

> "We conclude, however, that the developments in the six decades since *Keogh* was decided are insufficient to overcome the strong presumption of continued validity that adheres in the judicial interpretation of a statute ... **If there is to be an overruling of the Keogh rule, it must come from Congress, rather than from this Court."**

*Square D,* 476 U.S. at 424, 106 S.Ct. at 1930–1931 (Emphasis added). More recently, the Supreme Court reaffirmed the continued vitality of the *Keogh* filed-rate doctrine in *Maislin Industries, U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). The ICC has the ability to find a filed-rate unreasonable rendering that rate unenforceable. *Id.* 497 U.S. at 128, 110 S.Ct. at 2767. However,

> "[u]nder the *Negotiated Rates* policy, the ICC has determined that a carrier engages in an unreasonable practice when it attempts to collect the filed rate after the parties have negotiated a lower rate.... We disagree. For a century, this Court has held that the Act, as it incorporates the filed rate doctrine, forbids as discriminatory the secret negotiation and collection of rates lower than the filed rate. (citations omitted). By refusing to order collection of the filed rate because the parties had agreed to a lower rate, the ICC has permitted the very price discrimination that the Act seeks to prevent."

*Maislin Industries, U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. at 130, 110 S.Ct. at 2769. Thus, even the ICC is prohibited from preventing collection of the filed-rate due to **unreasonable practices** of the carrier when the carrier attempts to collect the filed rate after the parties had negotiated a lower rate. *Id.*

Two recent decisions further amplify the pervasive application of the *Keogh* rule with respect to actions against regulated entities. In *Sun City Taxpayers' Assn. v. Citizens Utilities Co.,* 45 F.3d 58 (2d Cir. 1995), citizens brought an action against a public utility claiming that the water and sewer utilities rates charged were established pursuant to a highly complex accounting fraud that misrepresented its costs, and that this scheme violated the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1961 *et seq.* In holding that the action was barred by the filed-rate doctrine, which had been recently applied by that same appellate court in *Wegoland Ltd. v. NYNEX Corp.,* 27 F.3d 17 (2d Cir.1994), the court observed:

> "*Wegoland,* like the present case, involved RICO claims, but the filed-rate doctrine has been implied in numerous other contexts. See, e.g., *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.,* 476 U.S. 409, 417, 423–24, 106 S.Ct. 1922, 1927, 1930–31, 90 L.Ed.2d 413 (1986) (antitrust); *Arkansas La. Gas Co. v. Hall,* 453 U.S. 571, 585–586, 101 S.Ct. 2925, 2933–34, 69 L.Ed.2d 856 (1981) (breach of contract); *Montana–Dakota Utils., Co. v. Northwestern Pub. Serv. Co.,* 341 U.S. 246, 251–53, 71 S.Ct. 692, 695–96, 95 L.Ed. 912 (1951) (fraud); *Keogh v. Chicago & N.W. Ry.,* 260 U.S. 156, 162–65, 43 S.Ct. 47, 49–50, 67 L.Ed. 183 (1922) (antitrust)."

*Sun City Taxpayers' Assn. v. Citizens Utilities Co.,* 45 F.3d at 62.

## V. DISCUSSION

Despite the overwhelming weight of the cited authorities, OLMI offers a number of arguments challenging the application of the filed-rate doctrine to the facts of this case. Close scrutiny of these arguments reveals that they are unmeritorious.

Some of the arguments have been explicitly rejected by other courts, including the Supreme Court; others are based upon a misreading of the applicable statutes; and still others are self-contradictory. The Court explains.

OLMI's principal argument is that 76% of the shipments it tendered to NPR under its TVA were of "exempt commodities;" that is, commodities which carriers may transport without filing rates thereon with any transportation agency.[8] OLMI argues that the governing statute recognizes the existence of exempt commodities (49 U.S.C. § 13506(a)(6); 13541(f)) and that the STB recognized the existence of exempt commodities in its regulations enacted under its rule-making authority (46 C.F.R. § 1312, and *Ex Parte No. 618, Regulations for the Publication, Posting and Filing of Tariffs for the Transportation of Property by or with a Water Carrier in the Noncontiguous Domestic Trade* ). According to OLMI, the meaning of exempt commodities is that they fall totally outside the regulatory parameters of the transportation agency, citing numerous ICC decisions in support of that proposition. *See, e.g., Puerto Rico Maritime Shipping Authority v. Valley Freight Systems, Inc.,* 856 F.2d 546, 548 (3rd Cir.1988); *Puerto Rico Maritime Shipping Authority & Puerto Rico MMI Trucking,* 7 I.C.C. 2nd 205 (1990) (petition for declaratory relief); *Henslin v. Roaasti Trucking, Inc.,* 69 F.3d 995 (9th Cir.1995); *Substituted Services—Charges And Practices Of For–Hire Carriers And Freight Forwards,* 322 I.C.C. 301 (1964); *Totem Ocean Trailer Express, Inc., Petition for Declaratory Order,* 22 S.R.R. 286 (August 15, 1983). The Court is not persuaded.

This is a classic red-herring, because the rate action by NPR which OLMI complains of bears no relation as to whether the shipments contain "exempt commodi-

ties" or not. First, OLMI has not challenged the inescapable conclusion that the rates reflected in the TVA had to be filed in NPR's tariff; a fact that OLMI concedes. As noted above, OLMI knew from the beginning that its TVA would be reflected in a filed tariff, because the very terms of that agreement required the shipper to make reference to the appropriate item number in NPR's tariff in submitting a draft of the bill of lading. Second, OLMI has not alleged that NPR infringed the exempt commodities provisions, and none of the causes of action of OLMI's First Amended Complaint is based on them. Third, neither OLMI's TVA, nor NPR's AQ rates, were restricted to exempt commodities. It was within OLMI's discretion of how to fulfill its volume commitment with exempt or non-exempt commodities, or a proportion of both.

OLMI's argument is not properly focused because the nerve center of its complaint revolves around the TVA and the AQ rates filed in NPR's tariff with the STB. It is the effect of the AQ rates upon OLMI's marketing efforts which is the lynchpin of the Counts 1, 2, 3, and 5 in OLMI's First Amended Complaint. Indeed, the Court would not be able to afford OLMI a comprehensive remedy without ordering NPR to take action with respect to its filed tariffs. Therefore, it is inescapable that the substance of OLMI's counts of the First Amended Complaint either attack or defend rates which had to be, and were, filed with the regulatory agency under a comprehensive regulatory system previously described.

Furthermore, the Court finds persuasive the reasoning in *G. & T. Terminal Packaging Co. v. Consolidated Rail Corp.,* 830 F.2d 1230 (3d Cir.1987), in which the Third Circuit expressly rejected the argument that the preemptive provision in 49 U.S.C.

---

**8.** NPR raised an issue regarding whether OLMI established that it did in fact ship 76% of so-called exempt commodities. According to NPR, the very statutory and regulatory authorities relied on by OLMI provide that only *some* agricultural commodities are in the exempt status category; others are not and must be transported only pursuant to filed tariff rates. This is an issue that the Court need not decide.

§ 10501(d) applies "only in cases in which the Commission fixed rates, and not in cases where it exercised its exemptive authority." *G. & T. Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d at 1234–236; *See also Alliance Shippers, Inc. v. Southern Pac. Transp. Co.*, 858 F.2d 567, 568–69 (9th Cir.1988). The Third Circuit held that the congressional deregulatory scheme did not reflect an intent to restore common law authority of state or federal courts even in cases of exempt commodities. In fact, the Third Circuit quoted an ICC administrative decision:

> "If another body were allowed to replace the regulatory restrictions dismantled at the Commission, the agency's exemptive actions would be nugatory. Worse, the potential for variation and conflict among various decisionmakers could make the post-exemption regime more restrictive of rail carriers than the one suspended by exemption. *Consolidated Rail Corporation—Declaratory Order—Exemption*, 1 ICC2d 895 (Feb. 27, 1987)."

*G.& T. Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d at 1235. The Third Circuit further opined that "[t]he Commission's analysis is consistent with that of the Supreme Court in the quite analogous context of deregulation of the natural gas industry." *Id.* (citing *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Board*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986)). Therefore, "the shippers' common law claims, whether considered as arising under state or federal common law, are preempted. *Abilene Cotton Oil* is still the controlling rule." *G.*

& *T. Terminal Packaging Co. v. Consolidated Rail Corp.*, 830 F.2d at 1235.[9]

NPR makes an argument based on the preemption doctrine in a deregulatory context under *Puerto Rico Department of Consumer Affairs v. Isla Petroleum Corporation*, 485 U.S. 495, 108 S.Ct. 1350, 99 L.Ed.2d 582 (1988). NPR stresses that, unlike predecessor legislation (the Interstate Commerce Act and the Shipping Act, 1916), the Termination Act provided a mechanism whereby *both* shipper and carrier could opt out of the entire regulatory system, and agree upon rates on any commodities whatsoever, which rates would not have to be filed with the regulatory agency. Thus the statute provides, 49 U.S.C. § 14101(b)(1), that a water carrier or a motor carrier and a water carrier in domestic noncontiguous trade can contract with a shipper to provide services at specified rates and conditions, and:

> "If the shipper and carrier, in writing, expressly waive any or all rights and remedies under this part for the transportation covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies ..."

Section 1410(b)(2) further provides that in that instance:

> "The exclusive remedy for any alleged breach of a contract entered into under this subsection shall be an action in an appropriate State court or United States district court, unless the parties otherwise agree."

---

**9.** Similarly in the field of Labor Relations under the Taft Hartley Act, Labor Management Relations Act, 1947 (Taft–Hartley Act) (June 23, 1947, ch. 120, 61 Stat. 136); 29 U.S.C. § 151 et. sec., even when the N.L.R.B. refused as a matter of discretion to extend jurisdiction to a dispute, the states were not free to act in these areas. *See San Diego Building Trades Council v. Garmon*, 353 U.S. 26, 77 S.Ct. 607, 1 L.Ed.2d 618 (1957); *Guss v. Utah Labor Relations Bd.*, 353 U.S. 1, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957); *Meat Cutters Local 427 v. Fairlawn Meats, Inc.*, 353 U.S. 20, 77 S.Ct. 604, 1 L.Ed.2d 613 (1957). States remained preempted under the N.L.R.B. from acting in exempt areas. Congress in 1959 enacted Section 14(c) of the statute authorizing states to enter into these areas. No Termination Act statute has been called to the attention of this Court granting jurisdiction to the states over exempt products.

If OLMI and NPR had entered into their agreement under this section, and if the gravamen of OLMI's complaint were not the filing of later rates in a tariff with the STB, then this Court would have faced the issue posed in *Isla Petroleum, supra,* namely, whether this deregulatory section in the legislation indicated a Congressional intention to preclude the application of state regulation, *e.g.,* Puerto Rico Law 75, to the transportation transaction. In *Isla Petroleum,* the Supreme Court teaches that a federal action *deregulating* an industry is not to be presumed as having the same preemptive effect as a federal action *regulating* an industry. 485 U.S., at 502–503, 108 S.Ct. 1350. But here, the parties plainly did not contract pursuant to § 14101(b), and consequently NPR's rates and conditions of service pertaining to OLMI remained subject to the full scope of the regulatory system devised by Congress.

Another argument urged by OLMI to escape the preemptive consequences of the filed-rate doctrine is that preemption does not apply where the plaintiff is a competitor, as opposed to a customer, of the transportation entity. We note first that this supposed "competitor exception" to the *Keogh* doctrine has not been accepted by the Supreme Court, **and has been rejected by several of the Circuit Courts that have considered it:** *Lifschultz Fast Freight v. Consolidated Freightways,* 805 F.Supp. 1277, 1295–296 (D.S.C.1992), *affirmed,* 998 F.2d 1009 (4th Cir.), *cert. denied,* 510 U.S. 993, 114 S.Ct. 553, 126 L.Ed.2d 454 (1993); *Pinney Dock & Transport Corp. v. Penn Central Corp.,* 838 F.2d 1445, 1455–460 (6th Cir.), *cert. denied,* 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988); *Matter of Wheat Rail Freight Rate Antitrust Lit.,* 759 F.2d 1305, 1309–316 (7th Cir.1985), *cert. denied,* 476 U.S. 1158, 106 S.Ct. 2275, 90 L.Ed.2d 718 (1986). *But see, In re Lower Lake Erie Iron Ore Antitrust Litigation,* 998 F.2d 1144, 1156–1163 (3d Cir.), *cert. dismissed,* 510 U.S. 1021, 114 S.Ct. 625, 126 L.Ed.2d 589 (1993); *City of Kirkwood v. Union*

*Elec. Co.,* 671 F.2d 1173, 1179 (8th Cir. 1982), *cert. denied,* 459 U.S. 1170, 103 S.Ct. 814, 74 L.Ed.2d 1013 (1983); *City of Groton v. Connecticut Light & Power Co.,* 662 F.2d 921, 929 (2d Cir.1981). In fact, the Supreme Court in *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 453, 65 S.Ct. 716, 724, 89 L.Ed. 1051 (1945), has already **"applied the *Keogh* doctrine in a case in which Georgia was both a customer and a competitor."** *Lifschultz Fast Freight,* 805 F.Supp. at 1295 (emphasis added). Notably, those decisions which have declined to apply the holding of *Keogh* to suits by competitors regard the filed-rate doctrine as a narrow and limited doctrine, and in some instances have viewed the Supreme Court's reaffirmation of the filed-rate doctrine in *Square D* as "simply an unwillingness to deliver a coup de grace to a weak and forcefully criticized doctrine because that function might be more appropriately carried out by Congress." *Capital Freight Services, Inc. v. Trailer Marine Transport Corp.,* 704 F.Supp. 1190, 1195 (S.D.N.Y.1988). As later noted by the same district court however:

"In light of the Supreme Court's 1990 decision in *Maislin,* which expanded the doctrine to invalidate a forcefully and deliberately presented ICC policy, the Supreme Court's embrace of the filed rate doctrine can no longer be viewed as so tepid."

*Wegoland, Ltd. v. NYNEX Corp.,* 806 F.Supp. 1112, 1116 n. 1 (S.D.N.Y.1992), *affirmed,* 27 F.3d 17 (2d Cir.1994).

At least one circuit that appears to have adopted the "competitor" exception to *Keogh, see Cost Management Services v. Washington Nat. Gas,* 99 F.3d 937, 943–48 (9th Cir.1996), has already limited its application and made clear that said doctrine does not apply where the "competitor" was acting similar to a customer: *County of Stanislaus v. Pacific Gas and Electric Company,* 114 F.3d 858, 866 (9th Cir.1997), *cert. denied,* — U.S. —, 118 S.Ct. 854, 139 L.Ed.2d 754 (1998)—a situation precisely presented here. Thus, even if the

"competitor" exception to the *Keogh* holding were binding on this Court, in this instance the doctrine is inapplicable, because OLMI's complaint is based upon its usage of NPR's services as a *shipper*, not as carrier. Moreover, the Supreme Court's recent decision in *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998), involved a situation where the plaintiffs was both a customer and a competitor of the regulated defendant. In finding for the defendant, the Supreme Court implicitly refused to adopt the "competitor" exception to the filed-rate doctrine.

In addition to these two principal arguments, OLMI makes other arguments based on the Termination Act. OLMI argues that this Court has "original jurisdiction" of the disputed counts under § 14704(c)(1) of the Termination Act. In so doing, OLMI misreads the reference to subsection (b) in that section to refer to subsection (b) of 14701, whereas it plainly applies to the same section, 14704. Moreover, even if *arguendo*, OLMI were correctly interpreting the statute, it would not aid its argument, because this provision

only grants jurisdiction to hear allegations of violations of the Termination Act (regarding collection actions); [10] whereas the counts of OLMI's complaint which are the subject of NPR's motion to dismiss on grounds of preemption are counts sounding in contract, tort, Law 75, and federal antitrust law.

The statute's saving clause does not change this Court's conclusion. OLMI argues that this Court has jurisdiction under § 13103 of the Termination Act, which also existed in the Interstate Commerce Act, 49 U.S.C. § 10103, states that: "Except as otherwise provided in this part, the remedies provided under this part are in addition to remedies existing under another law or common law." However, this same proviso in a more restrictive form, (i.e., § 22) was specifically considered by the Supreme Court, in *Texas & Pacific R. Co. v. Abilene Cotton Oil Co., supra*, which held that such statutory language did not override the preemptive power of the agency when complaints were based upon rates reflected in tariffs filed with regulatory transportation agencies.[11]

OLMI also argues that none of the precedents involving the ICC or the FMC are

**10.** Under the Termination Act, as under its predecessor statutes, while the regulatory agency exercises jurisdiction to hear cases charging violation of the Act, the courts, both federal and state, act as the forums for collection or for refund of transportation charges in suits brought by carriers or shippers for refunds. See *Reiter v. Cooper*, 507 U.S. 258, 269, 113 S.Ct. 1213, 1221, 122 L.Ed.2d 604 (1993). When these cases involve a particular issue that is specifically within the competence of a federal agency, the court may, if it so chooses, refer such issue to the agency for determination. Such a referral is an instance of the application of the doctrine of primary agency jurisdiction, *Reiter, supra*, 507 U.S. at 268, 113 S.Ct. 1213, and may entail the dismissal of all claims within the agency's primary jurisdiction. *See, Total Telecommunications Services, Inc. v. American Telephone and Telegraph Co.*, 919 F.Supp. 472, 478 (D.D.C.), affirmed, 99 F.3d 448 (D.C.Cir.1996).

**11.** *Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. at 446–47, 27 S.Ct. at 357–58 (quoting then § 22 "... Nothing in this act

contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies."). The Supreme Court noted that: "And by § 22, which we shall hereafter fully consider, existing appropriate common-law and statutory remedies were saved," *Id.* 27 S.Ct. at 354, but nevertheless held that permitting "standard[s] [which] would fluctuate and vary, dependent upon the divergent conclusions reached as to reasonableness by the various courts called upon to consider the subject ..." *Id.* 27 S.Ct. at 355, would be inconsistent with the basic statutory scheme: "Indeed the recognition of such a right is wholly inconsistent with the administrative power conferred upon the Commission, and with the duty, which the statute casts upon that body, of seeing to it that the statutory requirement as to uniformity and equality of rates is observed. *Equally obvious is it that the existence of such a power in the court ... would lead to favoritism, to the enforcement of one rate in one jurisdiction and a different one in another ...* " *Id.* (Emphasis added).

relevant here, because the Termination Act created a new and different agency, the STB. OLMI claims that because the Termination Act, unlike the Interstate Commerce Act and the Shipping Act, does not vest the agency it creates with power to immunize certain carrier actions from the reach of the antitrust laws, the *Keogh* and *Abilene Cotton Oil* line of cases become irrelevant.[12] The Court considers Plaintiff's argument invalid because the cases establishing the preemptive jurisdiction of transportation regulatory agencies as to filed rates did not rest upon the power of those agencies to grant antitrust immunity, but rather upon the preemptive implications to be derived from a tariff-filing and comprehensive regulatory system. That regulatory system is basically the same under the Termination Act as it was under its predecessors.

Finally, OLMI tries to evade the application of the filed-rate doctrine by arguing that it is not complaining *about the rates* filed in NPR's tariffs, *but about the termination* of its own contract and because NPR breached promises and covenants which were not expressly set forth in the TVA. OLMI placed considerable reliance on this argument during oral argument, stating that its contract with NPR was "much more than the TVA", to paraphrase OLMI's counsel, and that the filed-rate doctrine did not preempt an action seeking to enforce those promises. OLMI also downplayed the vitality of this preemption doctrine in the context of a claim such as the one presented by OLMI.

The argument fails in its objective, however, because even if, *arguendo*, OLMI's complaint could be construed only to refer to the "cancellation" of its contract of the breach of certain promises, *the rates which it alleges were canceled were applicable only because they were reflected in a filed tariff.* Without tariff publication by NPR in February, 1996 of the terms of the OLMI TVA, the contract rates with OLMI would have been wholly inoperative because NPR could not legally have assessed them. *Maislin Industries, U.S. Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990). Thus all substantive rights, shippers' as well as carriers', emanate from the publication of the terms of OLMI's time volume contract in the tariff that NPR filed with the STB.

In fact, however, as OLMI's own pleadings reveal, it was not the "canceling" of its contract to which OLMI objected (in the circumstances, such "canceling," if it actually took place, served only to excuse OLMI from the penalties for which it would otherwise have been liable for failure to make its minimum guarantees), but the filing of the AQ rates which had destroyed OLMI's preexisting differential. In defining its own cause of action OLMI states: "The [TVA] contract between the parties contains the implicit understanding that NPRI would not frustrate performance by undercutting the 'wholesale' or discounted rates" (Docket No. 15, Memorandum in Support of Opposition to Motion to Dismiss, p. 18) ... in other words, that NPR would not file AQ rates at the levels that it did. And later, OLMI states it even more explicitly:

> "[E]ven if this Court were to find that the TVA was not terminated by NPRI, defendant's acts of lowering its rates to the general public without affording OLMI a commensurate or equivalent reduction in rates, constituted an impairment or detriment to the existing relationship in direct contravention to Law 75".

---

12. Moreover, OLMI has not shown to this Court that any exemptions for price-setting from the antitrust laws have ever been given to water carriers in noncontiguous domestic offshore trade, by either the ICC or the FMC, and a Report to Congress submitted by the Department of Transportation in March, 1997 on "Competition in the Noncontiguous Domestic Trades", which is part of the record of this case, indicates that active price competition in the U.S.–Puerto Rican trades has driven the rates down in the last ten years.

Docket No. 15, Memorandum in Support of Opposition to Motion to Dismiss, p. 31.

Wherever OLMI turns, it meets the inescapable reality that its counts charging breach of contract, tort, violation of Law 75 and U.S. antitrust law are all based *on rates filed* in NPR's tariff with the STB, and thus subject to the preemptive power of that agency. *See Texas & Pacific R. Co. v. Abilene Cotton Oil Co.*, 204 U.S. at 441–42, 27 S.Ct. at 356. Thus none of OLMI's arguments, singly or together, furnish any basis for asserting jurisdiction over Counts 1, 2, 3, and 5 of the Complaint. Only the STB has jurisdiction to determine if the filing of the AQ rates in question on Refrigerated Containers in NPR's tariff, prior to the expiration of the filed Time Volume rates, violated the Termination Act's prescription against unreasonable rates and practices. *See* 49 U.S.C. §§ 13701(c) and 13702(b)(6).

Furthermore, the Supreme Court of the United States has reinforced the continued applicability of the filed-rate doctrine in an opinion issued at the end of last term in *American Telephone & Telegraph Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 118 S.Ct. 1956, 141 L.Ed.2d 222 (1998) ("*Central Office*"). In this Court's view, the holding in *Central Office* compels dismissal of Counts 1, 2 3, and 5 of the First Amended Complaint. The operative facts of that case closely resemble those at bar and the legal authority relied upon by the Supreme Court are the same as this Court has found controlling in this Opinion. *Cf. Central Office*, 118 S.Ct. at 1960–962.

In both cases the plaintiff was a customer as well as a competitor of the common carrier defendant which was subject to regulation by a federal agency. In both cases, the contract alleged to have been breached was a contract for the sale of services to be provided by the regulated entity at reduced rates for resale to the public at a profit. In both cases, the regulated entity was obligated to file tariffs with the regulatory agency covering its rates, charges and conditions pursuant to which it offered its services to customers, and make such filed rates available to all of its customers. In both cases, the regulated entity was forbidden from deviating from that tariff publication. Finally, in both cases, plaintiff filed under state law several claims for breach of contract and tort, including, *inter alia*, the allegations of stealing plaintiff's clients.

The Supreme Court held that these causes of action were preempted and barred by the filed-rate doctrine. These contract and tort claims were barred because in essence the customer was seeking to obtain an enlargement of rights conferred by the tariff, which would not be available to other customers (similar to Plaintiff's tort and local Law 75 claims). The Supreme Court held that this was impermissible because "[t]he rights as defined by the tariff cannot be varied or enlarged by either contract or tort of the carrier". *Central Office*, 524 U.S. at ——, 118 S.Ct. at 1965, 141 L.Ed.2d at 236 (citing *Keogh*, 260 U.S. at 163, 43 S.Ct. 47). A customer or competitor cannot escape preemption merely by arguing that its claim does not implicate filed rates but rather the carrier's alleged failure to abide by other obligations under contract or tort theories. Filed rates and terms of service do not exist in a vacuum. They exist in the context of the regulated services. A customer could easily obtain a benefit not available to other customers by simply couching its filed-rate claim as one for inadequate or wrongful services. *Central Office*, 524 U.S. at ——, 118 S.Ct. at 1962–63, 141 L.Ed.2d at 233.

This Court is persuaded that allowing OLMI's claims in this case would serve only to defeat the statutory command that all conditions pertinent to the application of rates be reflected in a tariff-filed with a federal regulatory agency, available to all users of the regulated company. The Court would be creating two classes of customers, those whose rights are exclusively defined by a filed tariff, and a preferred customer whose rights

are measured and considerably enlarged by alleged promises and covenants or under states rights foreign to the filed tariffs. The rights of the first class of customers would be uniformly determined by the regulatory agency, whereas the rights of the second class of customers would be determined by the courts and juries in all jurisdictions of the United States under a different set of rules.

Just one example proves that this result is simply incompatible with the federal interest of uniformity behind the preemptive mandate of the federal legislation. Time volume agreements, as the name implies, are for a fixed period of time. A customer who ships goods under the time volume rate can take advantage of this rate only for the term of the agreement. If Law 75 were to apply to the time volume agreement, only Puerto Rico based shippers could be entitled to keep these volume rates indefinitely on pain of the carrier facing the imposition of severe local state penalties for cancellation of the rate as provided by this statute. This benefit would certainly be in addition to that contracted for and offered to the other customers, and would result in unfair discrimination against this latter group of shippers.

The above analysis confirms that Congress intended such questions to be resolved solely by that agency in furtherance of the National Transportation Policy which is meticulously articulated therein. *See* 49 U.S.C. § 13101. Among the objectives of that policy is a specific direction pertinent to the domestic offshore trades:

"... it is the policy of the United States Government to oversee the modes of transportation and _____

(4) in overseeing transportation by water carrier, to encourage and promote service and price competition in the noncontiguous domestic trade."

49 U.S.C. § 13101(a) and (a)(4). Only the STB can determine whether a carrier who publishes a Time Volume rate in its tariff, which has a particular differential relationship with an Any Quantity rate has, as OLMI insists, an obligation to maintain that differential, or any other differential, to the end of the time specified in the Time Volume rate, or beyond. Clearly, such an obligation must be weighed in light of the Termination Act's standards and the policy considerations which the Act was designed to promote. And even more clearly, grafting the policies represented by Puerto Rico Law 75, or common law considerations pertinent to ordinary contract and tort actions, is contrary to the uniformity and consistency needed to implement a policy in a regulated industry.

WHEREFORE, Counts 1, 2, 3, and 5, of the First Amended Complaint are hereby DISMISSED.

IT IS SO ORDERED.